FILED CLERKS OFFICE

2018 FEB 12 AM 6:06

SHEILA LESTER
CRAWFORD COUNTY

# IN THE COURT OF COMMON PLEAS,
## CRAWFORD COUNTY, OHIO
### CIVIL DIVISION

| | |
|---|---|
| **KIMBERLITE APPLIED SCIENCE, LLC**<br>**220 Lincoln Avenue**<br>**Crestline, OH 44827**     : | |
| : | Case No. 18 CV0033 |
| **Plaintiff,**     : | Judge Sean E. Leuthold |
| : | |
| **v.**     : | |
| : | |
| **ALFRED R. GENIS**<br>**101 Franklin Street**<br>**Douglas, MA 01516**     : | |
| : | |
| **Defendant.**     : | |

## COMPLAINT

Plaintiff Kimberlite Applied Science, LLC ("Kimberlite"), for its Complaint against Defendant Alfred R. Genis ("Genis") alleges and avers as follows:

### PARTIES, JURISDICTION, AND VENUE

1.  Plaintiff Kimberlite is a limited liability company formed under the laws of the State of Ohio, having its principal place of business in Crestline, Crawford County, Ohio.

2.  Defendant Genis is a resident of the Commonwealth of Massachusetts who was employed by Kimberlite to principally do work in Ohio. Genis is a member of Kimberlite.

Exhibit A

3.      Subject matter jurisdiction is proper in this Court pursuant to R.C. 2305.01 because the amount in controversy exceeds the $15,000 jurisdictional limit of the Crawford County Municipal Court.

4.      This Court may exercise personal jurisdiction over Genis pursuant to R.C. 2307.382 because he has, inter alia, transacted business in this State and caused tortious injury in this State.  This Court also has personal jurisdiction over Genis because Genis is a member of Kimberlite and he consented to the personal jurisdiction of this Court by way of the forum-selection clause in the relevant agreements between Kimberlite and Genis providing the state courts of Ohio exclusive jurisdiction over matters arising out of the agreements.

5.      Venue is proper in this Court pursuant to Civ. R. 3(B) because Genis conducted activity in Crawford County and Kimberlite's principal place of business is located in Crawford County.  Venue is also proper in this Court by way of the forum-selection clause in the relevant agreements between Kimberlite and Genis providing that venue is proper in any state court in Ohio.

## FACTS COMMON TO ALL COUNTS

6.      Kimberlite is a limited liability company formed, effective October 4, 2013, for the purpose of designing, constructing, developing processes for, and selling chemical vapor deposition ("CVD") reactors.  In geologic terms, kimberlite is an igneous rock that often contains diamonds within its rock matrix.

7.      CVD reactors create various minerals, including diamonds, by depositing material on a substrate using varying amounts of heat, pressure, and time.

8.      The members of Kimberlite are non-parties Martin Campbell, David Campbell, and Defendant Alfred Genis.  Martin Campbell and David Campbell own 55% of the members' interest in Kimberlite.

9.      Martin Campbell is also the Chairman of Pure Crystal, LLC, ("Pure Crystal") a Delaware limited liability company whose principal place of business is in Crestline, Ohio and whose business activities include the use of microwave plasma CVD reactors to grow diamond in the laboratory, a process completely different and distinct from arc wave technology.  The sole members of Pure Crystal are Martin Campbell and David Campbell.

10.     Defendant Genis is a materials scientist who claims to have experience in arc wave CVD reactor technology.

11.     In September 2013, Martin Campbell, on his own behalf, met briefly with Genis in Boston, Massachusetts to discuss CVD reactors and laboratory-grown gem quality diamond using such reactors.  During that meeting, Genis represented to Martin Campbell that he had designed a functional CVD reactor using arc wave technology and that such technology was commercially capable of sustaining a viable laboratory diamond growing process.

12.     On or around October 4, 2013, Genis traveled to Ohio to discuss how he might be able to assist Martin and David Campbell in their laboratory diamond growth business utilizing arc wave technology.  During that meeting, as he had previously, Genis represented that his arc wave technology was a proven methodology that was a better commercial application than the Pure Crystal micro wave technology in growing gem quality laboratory diamond.  As a result of that meeting, Martin Campbell, David Campbell, and Genis entered into a letter of intent, dated October 4, 2013 ("Letter of Intent").  The Letter of Intent is attached as Exhibit A.

3

13.     On October 18, 2013, consistent with paragraph 2 of the Letter of Intent, Kimberlite was formed pursuant to a Certificate of Formation filed with the Secretary of State of the State of Ohio.  The Certificate of Formation is attached as Exhibit B.

14.     Thereafter, Martin Campbell, David Campbell, and Genis entered into an operating agreement for Kimberlite entitled Limited Liability Company Agreement of Kimberlite Applied Science, LLC ("Operating Agreement").  The Kimberlite Operating Agreement is attached as Exhibit C.  Genis executed the Operating Agreement on or about December 12, 2013 although the parties had been operating pursuant to the Operating Agreement effective October 4, 2013.

15.     Effective October 4, 2013, consistent with paragraph 1 of the Letter of Intent, Kimberlite and Genis entered into an employment agreement whereby Genis would serve as Kimberlite's Chief Technology Officer ("Employment Agreement").  The Kimberlite-Genis Employment Agreement is attached as Exhibit D.

16.     Paragraph 4 of the Employment Agreement contained various provisions including a non-disclosure provision whereby Genis agreed not to disclose Kimberlite's confidential information before and after his employment and further agreed that any such disclosure would entitle Kimberlite to money damages and injunctive relief

17.     Additionally, effective October 4, 2013, Kimberlite and Genis entered into an exclusive licensing agreement whereby Genis granted Kimberlite the exclusive right to use Genis's intellectual property used to develop laboratory-grown diamond pursuant to the Employment Agreement ("License Agreement").  The Kimberlite-Genis License Agreement is attached as Exhibit E.

18.     Genis represented to Kimberlite that he owned the intellectual property used to develop laboratory-grown diamond, including the patents and design specifications for manufacturing the arc wave reactor.

19.     The Genis intellectual property licensed to Kimberlite included, but was not limited to, the physical blueprint and specifications for building an arc wave reactor and the computer software necessary for the arc wave reactor to function.

20.     Genis represented that he had developed "recipes" (i.e. formulas consisting of several variables of heat, pressure, and time) that could be applied to the arc wave reactor to manufacture laboratory-grown diamonds.  These recipes were also among the intellectual property Genis exclusively licensed to Kimberlite.

21.     Genis executed the Employment Agreement, Operating Agreement, and License Agreement and emailed signature pages for each agreement to Martin Campbell on December 12, 2013.  Kimberlite performed all of its obligations pursuant to each agreement.

22.     Genis's primary, initial responsibility as the CTO of Kimberlite was to design and manage the build-out of an arc wave CVD reactor that could be used to grow diamond in the laboratory as Genis had represented.

23.     In order to manufacture the reactor, Genis and Kimberlite engaged CVD Equipment, Inc. ("CVD Equipment"), a Central Islip, New York company, and leader in the construction of CVD reactors.

24.     Genis, and Martin Campbell initially met with CVD Equipment personnel and CVD Equipment agreed to manufacture the arc wave reactor according to Genis's designs licensed to Kimberlite.  For financial reasons and at the request of CVD Equipment, an affiliate of the Campbell members financed the manufacture of the arc wave reactor.

25.     Genis provided the designs to CVD Equipment and over the course of several months, assisted CVD Equipment in the construction of the arc wave reactor at CVD Equipment's facility.

26.     The arc wave reactor never functioned properly at CVD Equipment's facility and was unable to produce the desired products.

27.     Genis represented to Kimberlite that he would be able to have the arc wave reactor fully functional and producing the desired products once it was installed at Kimberlite's Crestline, Ohio facility.

28.     In October 2014, the CVD Equipment-built, Genis-designed arc wave reactor was installed at Kimberlite's Crestline, Ohio facility.  A CVD Equipment engineer arrived to provide final on-site start-up of the arc wave reactor.  The arc wave reactor, however, failed to ever perform in a commercially sound manner at Kimberlite's facility.

29.     During the course of the Employment Agreement, Kimberlite fulfilled all of its obligations thereunder, including paying Genis an annual salary of $150,000, despite the fact that Genis never created an arc wave CVD reactor that performed as promised.

30.     During his employment with Kimberlite, Genis had access to Kimberlite's confidential information and trade secrets including, but not limited to, the results and details of multiple models that were developed in an attempt to perfect laboratory diamond growth with the arc wave CVD reactor.

31.     After three long years during which Kimberlite invested substantial funds, Kimberlite terminated Genis's Employment Agreement in September 2016.

32.     On information and belief, Genis has been marketing himself as a CVD reactor consultant to Kimberlite competitors since his employment was terminated.

33.     On information and belief, as a part of his self-promotion as a CVD reactor consultant, Genis is using confidential information and knowledge he obtained while working at Kimberlite, including but not limited to, the various modeling efforts employed in an effort to make Kimberlite's arc wave CVD reactor commercially viable.  Further, upon information and belief, Genis is using intellectual property for which Kimberlite has an exclusive license to promote himself as a consultant with Kimberlite competitors.

34.     Genis's acts as alleged herein have damaged Kimberlite in an amount in excess of $25,000; such exact amount to be determined at a trial in this matter.

## COUNT I: FRAUDULENT INDUCEMENT

35.     Kimberlite repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs, as if fully set forth herein.

36.     In September 2013, when Martin Campbell, and Genis met in Boston, Genis represented to Martin that he could manufacture a superior, commercially viable, unique arc wave CVD reactor that, with his intellectual property, could be used to grow gem quality laboratory diamond more effectively and efficiently than any other technology.

37.     Genis knew that his representations about his abilities and ownership of intellectual property that could effectuate laboratory diamond growth using arc wave technology were false.

38.     Again in October 2013, while visiting Martin and David Campbell in Ohio, Genis represented that he could manufacture a commercially viable arc wave CVD reactor that, with his intellectual property, could be used to grow gem quality laboratory diamond more effectively and efficiently than any other technology

39.     At the time of making these representations, Genis knew or reasonably should have known that his representations to Martin and David Campbell would be relied on by Kimberlite in deciding to enter into an employment agreement with Genis and hire Genis as its Chief Technology Officer and that his representations would be material to Kimberlite's hiring decision.

40.     At the time of making these representations, Genis knew the representations to be false.

41.     Genis made these representations with the intent to mislead Kimberlite into hiring him as its Chief Technology Officer.

42.     Kimberlite justifiably relied on Genis's representations in entering into the Employment Agreement.

43.     Genis's representations did not relate directly to the terms of the Employment Agreement, but related to the circumstances surrounding the making of the Employment Agreement and were in fact the reason for the creation of the Employment Agreement, the Licensing Agreement and granting Genis a member interest in Kimberlite.

44.     As a direct and proximate result of Genis's fraudulent inducement, Kimberlite has been injured in an amount in excess of $25,000, such exact amount to be determined at a trial in this case.

## COUNT II: MISAPPROPRIATION OF TRADE SECRETS

45.     Kimberlite repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs, as if fully set forth herein.

46.     Kimberlite possesses and has the exclusive right to use a variety of trade secrets related to the growing of diamonds in a laboratory setting using CVD reactors. Kimberlite's

trade secrets include but are not limited to designs, processes, procedures, methods, techniques, and other information used in the creation of and resulting from multiple models that were developed in an attempt to perfect laboratory diamond growth with the arc wave CVD reactor. Pursuant to the License Agreement, Kimberlite has exclusive rights to the blueprints for the arc wave reactor, the software developed for the arc wave reactor, and the "recipes" that were to be applied to the arc wave reactor to create the laboratory-grown diamond.

47.     During his employment as Chief Technology Officer, Genis provided trade secrets to Kimberlite, developed trade secrets that became the property of Kimberlite, and had access to Kimberlite's trade secrets.

48.     Following his termination with Kimberlite, upon information and belief, Genis has marketed himself as a CVD reactor expert and has sought to engage in the business of laboratory-grown diamonds relying in part on Kimberlite's trade secrets without Kimberlite's authorization and causing damage to Kimberlite.

49.     As a result of Genis's misappropriate of Kimberlite's trade secrets, Kimberlite has been injured in an amount in excess of $25,000, such exact amount to be determined at the trial in this case.

## COUNT III: BREACH OF EMPLOYMENT AGREEMENT

50.     Kimberlite repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs, as if fully set forth herein.

51.     The Employment Agreement is a valid and enforceable contract entered into between Kimberlite and Genis.

52.     Kimberlite possesses certain "Confidential Information" related to the growth of diamonds in a laboratory setting and identified in Paragraph 4.1 of the Employment Agreement with Genis.

53.     Kimberlite's Confidential Information includes, but is not limited to, the blueprints for the arc wave reactor, the software developed for the arc wave reactor, and the "recipes" that were to be applied to the arc wave reactor to create the laboratory-grown diamonds.

54.     Under Paragraph 4.1 of his Employment Agreement with Kimberlite, Genis agreed not to disclose such Confidential Information both during and after his employment and to hold such Confidential Information in strictest confidence.  Under Paragraph 4.6 of the Employment Agreement, Genis agreed that any unauthorized disclosure of such Confidential Information would entitle Kimberlite to damages and injunctive relief.

55.      Upon information and belief, Genis by marketing himself as a CVD reactor expert and consultant has materially breached the Employment Agreement by disclosing Confidential Information to unauthorized third parties.

56.     Kimberlite has performed all of its obligations under the Employment Agreement including having paid Genis a salary of $150,000. per year and issuing Genis equity interest in Kimberlite.

57.     Upon information and belief, Genis's breach of the Employment Agreement through his disclosure of Confidential Information has damaged Kimberlite and such damages continue to accrue and will continue to accrue unless Genis is enjoined from such disclosure.

58.     As a result of Genis's breach of the Employment Agreement, Kimberlite has been injured in an amount in excess of $25,000, such exact amount to be determined at the trial in this case.

## COUNT IV: BREACH OF LICENSE AGREEMENT

59.     Kimberlite repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs, as if fully set forth herein.

60.     The License Agreement is a valid and enforceable contract entered into between Kimberlite and Genis.

61.     Under Article 5 of the License Agreement, Genis agreed not to disclose or otherwise communicate Kimberlite's Confidential Information to others, or to use Kimberlite's Confidential Information for any purpose other than what was identified in the License Agreement.

62.     Kimberlite's Confidential Information includes, but is not limited to, the blueprints for the arc wave reactor, the software developed for the arc wave reactor, and the "recipes" that were to be applied to the arc wave reactor to create the laboratory-grown diamonds.

63.     Under Article 2 of the License Agreement, Genis granted Kimberlite the exclusive right to use his Intellectual Property.

64.     Genis represented to Kimberlite that he owned the Intellectual Property, including trade secrets, patents, and copyrights, necessary to manufacture his arc wave CVD reactor.

65.     Upon information and belief, Genis has materially breached the License Agreement by disclosing Confidential Information and Intellectual Property belonging to Kimberlite to third parties beyond that which is permitted by the License Agreement.

66.     Kimberlite has performed all of its obligations under the License Agreement including compensating Genis by granting him an equity interest in Kimberlite.

67.     Upon information and belief, Genis's breach of the License Agreement through his disclosure of Confidential Information and Intellectual Property has damaged Kimberlite and such damages continue to accrue and will continue to accrue unless Genis is enjoined from such disclosure.

68.     As a result of Genis's breach of the License Agreement, Kimberlite has been injured in an amount in excess of $25,000, such exact amount to be determined at the trial in this case.

## COUNT V: UNJUST ENRICHMENT
(in the alternative)

69.     Kimberlite repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs, as if fully set forth herein.

70.     Kimberlite provided materials, facilities, and financial payments to Genis for the development of a commercially viable arc wave CVD reactor, which benefited Genis.

71.     Genis knowingly retained the benefits provided by Kimberlite, despite failing to ever provide a commercially viable arc wave CVD reactor.

72.     Retention of these benefits by Genis, without Genis repaying Kimberlite would be unjust.

73.     Genis has been unjustly enriched in the amount in excess of $25,000 as Genis knew Kimberlite was not providing him with materials, facilities, and financial payments gratuitously.

74.     Genis's unjust enrichment has caused and continues to cause damage to Kimberlite in excess of $25,000, the exact amount to be determined at trial.

## COUNT VI: INJUNCTION

75.     Kimberlite repeats and incorporates herein by reference each and every allegation

contained in the preceding paragraphs, as if fully set forth herein.

76.     Upon information and belief, Genis's marketing of himself as an expert consultant

in CVD reactor technology necessitates the use and disclosure of trade secrets, Confidential

Information, and Intellectual Property owned by or exclusively controlled by Kimberlite.

77.     Genis's use and disclosure of Kimberlite's trade secrets, Confidential

Information, and Intellectual Property are in violation of the rights granted Kimberlite and

obligations of Genis pursuant to the Employment Agreement and License Agreement.

78.     Kimberlite has no adequate remedy at law or otherwise for the harm or damage

caused by Genis because Kimberlite will be unable to retrieve any trade secrets, Confidential

Information, or Intellectual Property belonging to Kimberlite which Genis discloses to third

parties.

79.     Genis's use and disclosure of Kimberlite's trade secrets, Confidential

Information, and Intellectual Property will cause Kimberlite irreparable damage by, inter alia,

providing Kimberlite's competitors with sensitive business information that can be used in the

laboratory-grown diamond business unless Genis's use and disclosure of such information is

enjoined

80.     Pursuant to R.C. 2727, Kimberlite seeks to restrain Genis from using and

disclosing Kimberlite's trade secrets, Confidential Information, and Intellectual Property.

WHEREFORE, Kimberlite demands that judgment be entered in its favor and against

Genis and that Kimberlite be awarded an amount to be proven at trial, as well as pre-judgment

interest, post-judgment interest, attorneys' fees, expenses of litigation, court costs and other such relief to which Kimberlite is entitled.

Kimberlite further demands injunctive relief against Genis prohibiting Genis from continuing the unauthorized disclosure of Kimberlite's trade secrets and Confidential Information to third parties.

Kimberlite further demands that Genis be divested of his ownership interest in Kimberlite, which was premised upon his fraudulent representations made prior to the entering of the Employment Agreement.

Dated: February 9, 2018

_____
James D. Abrams (0075968), Trial Counsel
Michael K. Robertson (0095984)
Taft Stettinius & Hollister, LLP
65 East State Street, Suite 1000
Columbus, OH 43215-4213
T: (614) 221-2838
F: (614) 221-2007
jabrams@taftlaw.com
mrobertson@taftlaw.com

*Counsel for Plaintiff*
*Kimberlite Applied Science, LLC*

22010605.5

14

# EXHIBIT A

October 4, 2013

Alfred R. Genis and Martin and David Campbell agree that:

1. Mr. Genis will be paid $12,500 per month by an entity owned by Martin and David Campbell

2. They will form a company (Reactor Building Company) to license Mr. Genis' reactor technology for a next generation DC-arc single crystal diamond reactor. The company will build the first reactor, which will be purchased by Pure Crystal, LLC, installed in the Pure Crystal facility, commissioned to grown single crystal, G-H quality diamond and the reactor design marketed world-wide.
   a. Pure Crystal will pay Mr. Genis' expenses devoted to the design and building of the reactor
   b. Mr. Genis will own 45% of the shares of the Reactor Building Company
   c. Martin and David Campbell will own 55% of the shares of the Reactor Building Company

3. Mr. Genis will join Pure Crystal, LLC as Chief Technology Officer
   a. Mr. Genis will receive 25% of the shares of Pure Crystal for his services as Chief Technology Officer

4. Mr. Genis and Martin and David Campbell agree to form a company (Diamond Application Company) to develop and sell technology for the use of diamond in non-gem applications.
   a. Mr. Genis will own 55% of the shares of the Diamond Application Company
   b. Martin and David Campbell will own 45% of the shares of the Diamond Application Company

_____
Alfred R. Genis

_____
Martin A. Campbell

_____
David C. Campbell

**EXHIBIT**

A

# EXHIBIT B



| DATE:<br>10/01/2012 | DOCUMENT ID<br>201227500703 | DESCRIPTION<br>REGISTRATION OF FOREIGN FOR<br>PROFIT LLC (LFP) | FILING<br>125.00 | EXPED<br>.00 | PENALTY<br>.00 | CERT<br>.00 | COPY<br>.00 |
|---|---|---|---|---|---|---|---|

**Receipt**

This is not a bill. Please do not remit payment.

PURE CRYSTAL, LLC
220 LINCOLN AVE.
CRESTLINE, OH 44827

# STATE OF OHIO
## CERTIFICATE
### Ohio Secretary of State, Jon Husted

**2140033**

It is hereby certified that the Secretary of State of Ohio has custody of the business records for

**PURE CRYSTAL, LLC**

and, that said business records show the filing and recording of:

Document(s):                                                    Document No(s):

**REGISTRATION OF FOREIGN FOR PROFIT LLC**            **201227500703**



United States of America
State of Ohio
Office of the Secretary of State

Witness my hand and the seal of the
Secretary of State at Columbus, Ohio
this 28th day of September, A.D.
2012.

*Jon Husted*

Ohio Secretary of State

---

**EXHIBIT**

tabbies®

B

# *Delaware*

PAGE  1

## *The First State*

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF FORMATION OF "PURE CRYSTAL, LLC",
FILED IN THIS OFFICE ON THE THIRTEENTH DAY OF SEPTEMBER, A.D.
2012, AT 5:33 O'CLOCK P.M.

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 9856175

DATE: 09-19-12

5177089  8100

121029628

You may verify this certificate online
at corp.delaware.gov/authver.shtml

State of Delaware
Secretary of State
Division of Corporations
Delivered 05:33 PM 09/13/2012
FILED 05:33 PM 09/13/2012
SRV 121029628 - 5177089 FILE

## STATE OF DELAWARE
## LIMITED LIABILITY COPANY
## CERTIFICATE OF FORMATION

**First:** The name of the limited liability company is **Pure Crystal, LLC.**

**Second:** The address of its registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street in the City of Wilmington.  Zip code 19801. The name of the registered agent at such address is The Corporation Trust Company.

**In Witness Whereof,** the undersigned has executed this Certificate of Formation this 13th day of September, 2012.

By: *Robert A Sauro*

Robert A. Sauro
Attorney in fact

Division of Corporations - Online Services                    Page 1 of 1



## State of Delaware
The Official Website for the First State

*The Secretary of State of Delaware issued a certificate for PURE CRYSTAL, LLC whose file number is 5177089 on 09/19/2012 under request number 121029628 for authentication number 9856175.*



[Back]

# EXHIBIT C

**KIMBERLITE APPLIED SCIENCE, LLC**

**LIMITED LIABILITY COMPANY AGREEMENT**

Dated as of December~~NOVEMBER~~ ____, 2013

**THE UNITS REPRESENTED BY THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY OTHER APPLICABLE FEDERAL OR STATE SECURITIES LAWS. SUCH UNITS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER THE SECURITIES ACT AND LAWS OR AN EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFER SET FORTH HEREIN.**

**EXHIBIT**

tabbies®

C

# TABLE OF CONTENTS

Page

EXPLANATORY STATEMENT ..................................................................................... 1

ARTICLE 1 DEFINITIONS ........................................................................................... 1

ARTICLE II ORGANIZATIONAL MATTERS............................................................. 10

| | | |
|---|---|---|
| Section 2.1 | Formation of the Company ..................................................... | 10 |
| Section 2.2 | Name................................................................................ | 10 |
| Section 2.3 | Purpose.............................................................................. | 10 |
| Section 2.4 | Location of Principal Place of Business ..................................... | 11~~11~~10 |
| Section 2.5 | Registered Office and Registered Agent.................................... | 11 |
| Section 2.6 | Unit Holders....................................................................... | 11 |
| Section 2.7 | Term................................................................................. | 11 |
| Section 2.8 | No State Law Partnership ...................................................... | 11 |
| Section 2.9 | Voting Rights...................................................................... | 11 |

ARTICLE III UNITS AND CAPITAL CONTRIBUTIONS ........................................ 12

| | | |
|---|---|---|
| Section 3.1 | Units................................................................................. | 12 |
| Section 3.2 | Capital Contributions............................................................ | 12 |
| Section 3.3 | Additional Capital Contributions.............................................. | 12 |
| Section 3.4 | Return of Capital Contributions............................................... | 12 |
| Section 3.5 | Capital Accounts.................................................................. | 13 |
| Section 3.6 | Loans................................................................................ | 13 |
| Section 3.7 | Representations, Warranties and Covenants of Unit Holders............. | 13 |

ARTICLE IV DISTRIBUTIONS .................................................................................. 14

| | | |
|---|---|---|
| Section 4.1 | Distribution Generally .......................................................... | 14 |
| Section 4.2 | Distributions of Net Cash Flow ............................................... | 14 |
| Section 4.3 | Withholding Taxes................................................................ | 14 |
| Section 4.4 | Distributions with Respect to Tax............................................. | 14 |

ARTICLE V INCOME AND LOSSES ......................................................................... 15

| | | |
|---|---|---|
| Section 5.1 | Allocation of Net Income and Net Losses................................... | 15 |
| Section 5.2 | Regulatory Allocations.......................................................... | 15 |
| Section 5.3 | Contributed Property and Book-Ups | 16 |

ARTICLE VI POWERS, RIGHTS AND DUTIES OF THE BOARD AND MEMBERS.......... 16

| | | |
|---|---|---|
| Section 6.1 | Management of the Company. ................................................. | 16 |
| Section 6.2 | Duties and Time Devoted to Business; Other Activities; Transactions with Affiliates.................................................. | 19 |
| Section 6.3 | Rights of the Members........................................................... | 19 |
| Section 6.4 | Liability and Indemnification. ................................................ | 19 |

i

ARTICLE VII TRANSFER OF MEMBERSHIP RIGHTS AND UNITS; WITHDRAWAL OF MEMBERS ........................................................................................................... 21

Section 7.1 Transfers. ......................................................................................21
Section 7.2 Permitted Transfers. .......................................................................22
Section 7.3 Voluntary Withdrawal of Members ................................................22
Section 7.4 Continuation of Company Upon Voluntary or Involuntary Withdrawal .................................................................................232322
Section 7.5 Drag-Along. ...................................................................................23
Section 7.6 Right of First Refusal .....................................................................23
Section 7.7 Co-Sale Right .................................................................................25
Section 7.8 Transferees Bound by Agreement ..................................................26

ARTICLE VIII DISSOLUTION, LIQUIDATION, AND TERMINATION OF THE COMPANY .................................................................................................................... 26

Section 8.1 Dissolution .....................................................................................26
Section 8.2 Procedure for Winding Up ..............................................................26
Section 8.3 Distributions at Liquidation ...........................................................26
Section 8.4 Negative Capital Account ...............................................................27
Section 8.5 Termination ....................................................................................27

ARTICLE IX BOOKS, RECORDS, ACCOUNTING, AND TAX ELECTIONS ..................... 27

Section 9.1 Bank Accounts ...............................................................................27
Section 9.2 Books and Records .........................................................................27
Section 9.3 Annual Accounting Period and Taxable Year .................................27
Section 9.4 Reports ...........................................................................................27
Section 9.5 Tax Matters Partner ........................................................................28
Section 9.6 Tax Elections .................................................................................28
Section 9.7 Title to Company Property ..............................................................28
Section 9.8 Conversion of the Company ...........................................................28

ARTICLE X AMENDMENTS AND WAIVERS ................................................................ 28

Section 10.1 Amendments and Waivers ...........................................................29
Section 10.2 Amendments Without Consent of the Members ...........................29

ARTICLE XI GENERAL PROVISIONS ........................................................................... 29

Section 11.1 Uniform Commercial Code ..........................................................29
Section 11.2 Further Assurances .......................................................................29
Section 11.3 Notifications .................................................................................29
Section 11.4 Specific Performance ...................................................................30
Section 11.5 Complete Agreement ....................................................................30
Section 11.6 Applicable Law; Venue ................................................................30
Section 11.7 Section Titles ................................................................................30
Section 11.8 Binding Provisions .......................................................................30
Section 11.9 No Third Party Beneficiaries ........................................................30
Section 11.10 Terms .........................................................................................30

Section 11.11  Severability of Provisions ..................................................................30
Section 11.12  Counterparts, Facsimile; Reproductions .................................................31

**LIMITED LIABILITY COMPANY AGREEMENT**
**OF KIMBERLITE APPLIED SCIENCE, LLC**

This **LIMITED LIABILITY COMPANY AGREEMENT** of KIMBERLITE APPLIED SCIENCE, LLC, a limited liability company formed under the laws of the State of Ohio (the "**Company**") is effective as of the _____ day of November, 2013 (the "**Effective Date**"), by and among the Members (as defined below) and those Unit Holders (as defined below) executing this Agreement from time to time in accordance with the terms hereof.  The parties hereto agree as follows:

## EXPLANATORY STATEMENT

(A)     The Company was formed pursuant to a Certificate of Formation (the "**Certificate of Formation**") filed with the Secretary of State of the State of Ohio on October 18, 2013.

(B)     Each party hereto desires to enter into this Agreement to govern the relations of the parties from and after the Effective Date in accordance with the terms and subject to the conditions set forth in this Agreement.

## AGREEMENT

## ARTICLE 1

## DEFINITIONS

The following capitalized terms shall have the meanings specified in this **Article I.** Other terms are defined in the text of this Agreement; and, throughout this Agreement, those terms shall have the meanings respectively ascribed to them.

"Act" shall mean Chapter 1705 of the Ohio Revised Code, as amended from time to time.

"Adjusted Capital Account" shall equal, with respect to each Unit Holder and at any time, the Unit Holder's Capital Account at such time (x) increased by the sum of (A) the amount of the Unit Holder's share of partnership minimum gain (as defined in Regulation §§1.704-2(g)(1) and (3)), (B) the amount of the Unit Holder's share of partner nonrecourse debt minimum gain (as defined in Regulation §1.704-2(i)(5)), and (C) any amount of the deficit balance in its Capital Account the Unit Holder is obligated to restore on liquidation of the Company and (y) decreased by reasonably expected adjustments, allocations and distributions described in Regulation §§1.704-1(b)(2)(ii)(d)(4), (5) and (6).

"Adjusted Capital Account Deficit" means, with respect to any Interest Holder, the deficit balance, if any, in the Interest Holder's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

(i) the deficit shall be decreased by the amounts (if any) which the Interest Holder is obligated to restore pursuant to Section 4.4.2 or is deemed obligated to restore pursuant to Regulation Section 1.704-1(b)(2)(ii)(c); and

Formatted: Footer

(ii) the deficit shall be increased by the items described in Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5), and (6).

"Adjusted Capital Contribution" means, for each Unit Holder, an amount equal to (i) such Unit Holder's aggregate Capital Contribution, reduced (but not reduced to an amount less than zero) by (ii) the aggregate amount of any distributions previously made to that Unit Holder pursuant to **Section 4.2(a)** or **Section 8.3(d)**.

"Affiliate" with, respect to any Person, means:  (i) any other Person owning 50% or more of the voting or beneficial interests of a subject Person; (ii) any other Person directly or indirectly controlling, controlled by or under common control with the subject Person; or (iii) any officer, director, trustee, general partner, manager or managing member of the subject Person; (iv) any individual which is a Family Member of such Person; provided that, for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" shall mean this Limited Liability Company Agreement, as amended from time to time in accordance with its terms.

"Applicable Law" means any law, statute, regulation, rule, ordinance, order, consent decree, settlement agreement or governmental requirement, and any judgment, decision, decree, writ, injunction, award, ruling or order of any Governmental Body, including, but not limited to, the Act and the Securities Act.

"Approved Sale" shall have the meaning set forth in **Section 7.5(a)** hereof.

"Bankruptcy" shall mean, with respect to a Unit Holder, the happening of any of the following:  (i) the filing of an application by such Unit Holder for, or a consent to, the appointment of a trustee of all or a portion of the Unit Holder's assets for the benefit of creditors generally, (ii) the filing by such Unit Holder of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing the Unit Holder's inability to pay the Unit Holder's debts generally as they come due, (iii) the making by such Unit Holder of a general assignment for the benefit of creditors, (iv) the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating such Unit Holder as bankrupt in any bankruptcy or insolvency proceeding or appointing a trustee of all or a portion of the Unit Holder's assets for the benefit of creditors generally, and such order, judgment or decree continuing unstayed and in effect for a period of ninety (90) days, or (v) the institution of a proceeding seeking a judgment of insolvency or bankruptcy with respect to a Unit Holder or any other relief with respect to a Unit Holder under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for the Unit Holder's winding-up or liquidation, and such proceeding or petition is not dismissed or discharged within ninety (90) days.

"Board" shall have the meaning set forth in **Section 6.1(a)(i)** hereof.

2

"Business" shall mean the business of conceiving, designing, developing, manufacturing, licensing, servicing, marketing and selling chemical vapor deposition reactors and chemical vapor deposition integrated systems, including but not limited to ECR etch and chemical vapor deposition production processes and process tools, for research and production applications to customers throughout the world.

"Business Day" shall mean any day other than Saturday, Sunday and a day on which commercial banks are authorized or required to close in Columbus, Ohio.

"Capital Account" shall mean, with respect to each Unit Holder, the account established and maintained for the Unit Holder on the books of the Company in compliance with Regulation §1.704-1(b)(2)(iv). For this purpose, the Company may, upon the occurrence of any of the events specified in Regulation §1.704-1(b)(2)(iv)(f), increase or decrease the Capital Accounts in accordance with rules of such regulation and Regulation §1.704-1(b)(2)(iv)(g) to reflect a revaluation of Company property. Upon the exercise of a non-compensatory option (within the meaning of proposed Regulations Section 1.721-2(d), as the same may be finalized), (x) the adjustments and allocations required by the Proposed Treasury Regulations relating to non-compensatory options (as the same may be finalized), including Proposed Treasury Regulations Section 1.704-1(b)(2)(iv)(h)(2) and (s) (as the same may be finalized) and Proposed Regulations Section 1.704-1(b)(4)(ix) (as the same may be finalized), shall be made, or (y) prior to the finalization of such Proposed Treasury Regulations, such other adjustments and allocations shall be made at such times as determined by the Board in its sole discretion.

"Capital Contribution" shall mean the total amount of cash and the Gross Asset Value of any other assets contributed to the Company by a Unit Holder, net of any liabilities assumed or to which such assets are subject.

"Cause" means, when used in reference to a Member or to a Manager (or its control Person), that: (i) such Member or Manager (or its control Person) has committed an act or acts of dishonesty or fraud (including embezzlement or misappropriation of funds) with respect to the Company or any of its Subsidiaries, (ii) such Member or Manager (or its control Person) has committed an intentional act or gross negligence that brings the Company or any of its Subsidiaries into public disgrace or public disrepute or that otherwise has, or was intended to have, a material, detrimental effect on the reputation or business of the Company or any of its Subsidiaries, (iii) such Member or Manager (or its control Person) is grossly negligent in the performance of, or has refused after notice thereof, to perform, such Member's or Manager's (or its control Person's) duties and responsibilities to the Company and its Subsidiaries, or (iv) such Member or Manager (or its control Person) has materially breached this Agreement and has failed to cure such breach within thirty (30) days of written notice thereof. The determination of whether a Member or Manager (or its control Person) has committed an act, failed to act or otherwise engaged in behavior constituting "Cause" as defined above shall be determined by the Board in its reasonable discretion.

"Certificate of Formation" shall mean the Company's Certificate of Formation as filed with the Ohio Secretary of State on October 18, 2013.

"Code" shall mean the United States Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law.

"Company" shall mean the limited liability company formed pursuant to the Certificate of Formation.

"Co-Sale Offer" shall have the meaning set forth in **Section 7.7(a)** hereof.

"Co-Sale Units" shall have the meaning set forth in **Section 7.7(a)** hereof.

"Co-Sale Transferee" shall have the meaning set forth in **Section 7.7(a)** hereof.

"Disability" means, when used in reference to a Member or Manager (or its control Person), an occurrence causing physical or mental illness, injury or infirmity of such a nature, degree or effect as to render such Member or Manager (or its control Person) substantially unable to perform such Member's or Manager's duties and responsibilities under this Agreement for a total of 180 days in any 365-day period.  The Board (but not including the Manager in question, if applicable) shall determine, according to the facts then available, whether and when a Member's or Manager's (or its control Person) Disability has occurred. Such determination shall not be arbitrary or unreasonable and the Board, in making such determination, shall take into consideration the opinion of the Member's or Manager's (or its control Person) personal physician, if reasonably available, but such determination by the Board shall be final and binding on the Company and such Member or Manager (or its control Person).

"Effective Date" shall have the meaning set forth in the preamble to this Agreement.

"Electing ROFR Unit Holder" shall have the meaning set forth in **Section 7.6(c)** hereof.

"Employment Agreement" shall mean that certain Employment Agreement, dated as of October 4, 2013, by and between Alfred Genis, as amended or otherwise modified and in effect.

Formatted: Underline

"Family Member" shall mean, with respect to any individual, such individual's spouse, children and grandchildren.

"First Refusal Portion" shall have the meaning set forth in **Section 7.6(b)** hereof.

"Fiscal Year" shall mean each twelve-month period (or portion thereof) beginning on January 1 and ending on December 31 of each year.

"Governmental Body" shall mean any:

(a)      federal, state, county, municipal, city, town village, district, or other jurisdiction or government of any nature, including, without limitation, foreign jurisdictions or governments;

(b)      U.S. or foreign governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department or official or other entity

4

exercising governmental or quasi-governmental powers, any regulatory or self-regulatory organization and any court or other tribunal); or

(c)     U.S. or foreign body exercising, or entitled or purporting to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

"Gross Asset Value" shall mean, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)     The initial Gross Asset Value of any asset contributed by a Unit Holder to the Company shall be the gross fair market value of such asset, as reasonably determined by the Board;

(b)     The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as reasonably determined by the Board, as of the following times:

(i)     The acquisition of an additional interest in the Company by any new or existing Unit Holder in exchange for more than a de minimis Capital Contribution if the Board reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Unit Holders in the Company;

(ii)     The distribution by the Company to a Unit Holder of more than a de minimis amount of Company property as consideration for an interest in the Company if the Board reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Unit Holders in the Company;

(iii)     The liquidation of the Company within the meaning of Regulation Section 1.704-l(b)(2)(ii)(g); and

(iv)     The grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Unit Holder acting in a Unit Holder capacity, or by a new Unit Holder acting in a Unit Holder capacity or in anticipation of becoming a Unit Holder of the Company, if the Board reasonably determines that such adjustment is necessary or appropriate to reflect the relative interests of the Unit Holders in the Company;

(c)     The Gross Asset Value of any Company asset distributed to any Unit Holder shall be the gross fair market value of such asset on the date of distribution as reasonably determined by the Board; and

(d)     The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Section 734(b) or Section 743(b) of the Code, but only to the extent that such adjustments are taken into

5

account in determining capital accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m); provided, however, that Gross Asset Values shall not be adjusted pursuant to this subsection to the extent the Board reasonably determines that an adjustment pursuant to **subsection (b)** is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this **subsection (d)**.

If the Gross Asset Value of an asset has been determined or adjusted pursuant to **subsection (a), (b)** or **(d)** hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Income and Net Losses.

"Holdco" shall have the meaning set forth in **Section 9.8** hereof.

"Indemnified Parties" shall have the meaning set forth in **Section 6.4(c)** hereof.

"Involuntary Withdrawal" shall mean, with respect to any Member, the occurrence of any of the following events:

(i)     the Bankruptcy of such Member;

(ii)     if the Member is acting as a Member by virtue of being a trustee of a trust, the termination of such trust;

(iii)     if the Member is a partnership or another limited liability company, the dissolution and commencement of winding up of the partnership or limited liability company;

(iv)     if the Member is a corporation, the dissolution of the corporation or the revocation of its charter;

(v)     if the Member is an individual, the Member's death, appointment of a guardian or general conservator for the member or adjudication by a court of competent jurisdiction as incompetent to manage the Member's person or property or perform the Member's duties hereunder; or

(vi)     any other event causing the resignation of a Member under the Act other than a Voluntary Withdrawal.

"Liquidating Agent" shall have the meaning set forth in **Section 8.2** hereof.

"Majority-in-Interest of the Members" shall mean Members whose aggregate Percentage Interest exceeds 50% of the Percentage Interest of all Members entitled to vote with respect to the applicable matter coming before the Members.

"Manager" shall mean each Person elected to the Board in accordance with **Article VI** hereof.

"Member" shall mean each Person signing this Agreement and any Person who subsequently is admitted as a Member of the Company in accordance with the terms of this Agreement.

"Membership Rights" shall mean all of the rights of a Member in the Company subject to the terms and conditions of this Agreement, including a Member's:  (i) Units; (ii) right to inspect the Company's books and records; and (iii) right to vote on matters coming before the Members, subject to the terms and conditions of **Article VI** of this Agreement.

"Minimum Gain" has the meaning set forth in Regulation Section 1.704-2(d). Minimum Gain shall be computed separately for each Interest Holder in a manner consistent with the Regulations under Code Section 704(b).

"Negative Capital Account" shall mean a Capital Account with a balance of less than zero.

"Net Cash Flow" means all cash funds derived from operations of the Company (including interest received on reserves), without reduction for any non-cash charges, but less cash funds used to pay current operating expenses and to pay or establish reasonable reserves for future expenses, debt payments, capital improvements, and replacements as determined by the Manager.  Cash Flow shall not include Capital Proceeds but shall be increased by the reduction of any reserve previously established.

"Net Equity Value" shall mean, as of any particular date, the aggregate proceeds which would be received by the Unit Holders if: (i) the assets of the Company as a going concern were sold at their fair market value; (ii) the Company satisfied and paid in full all of its obligations and liabilities (including all taxes, costs and expenses of the Company incurred in connection with such transaction and any reserves reasonably established by the Board for contingent liabilities); and (iii) such net sale proceeds were then distributed in accordance with **Section 4.2**, all as of such particular date and as determined by the Board in its reasonable discretion.

"Net Income" and "Net Losses" shall mean, for each Fiscal Year or other allocation period of the Company, an amount equal to the Company's taxable income or loss for such year or period and shall be determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

(a)      Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Income or Net Losses pursuant to this Section shall be added to such taxable income or loss;

(b)      Any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Regulations, and not otherwise taken into account in computing Net Income or Net Losses pursuant to this Section, shall be subtracted from such taxable income or loss;

(c)     In the event the Gross Asset Value of any Company asset is adjusted (as provided in clause (b) or (c) of the definition of Gross Asset Value herein), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Income or Net Losses;

(d)     Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(e)     In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period; and

(f)     To the extent that an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Regulation Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as the result of a distribution other than in liquidation of a Unit Holder's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Net Income or Net Losses.

"New Entities" shall have the meaning set forth in **Section 9.8** hereof.

"Notice" shall have the meaning set forth in **Section 11.3** hereof.

"Offer" shall have the meaning set forth in **Section 7.6(a)** hereof.

"Offer Period" shall have the meaning set forth in **Section 7.6(a)** hereof.

"Offered Units" shall have the meaning set forth in **Section 7.6(a)** hereof.

"Oversubscription Offer Period" shall have the meaning set forth in **Section 7.6(c)** hereof.

"Percentage Interest" shall mean, with respect to any Unit Holder, the percentage computed as one hundred (100) times a fraction, the numerator of which is equal to the number of Units held by such Unit Holder, and the denominator of which is equal to the total number of Units then issued and outstanding.

"Permitted Transfer" shall have the meaning set forth in **Section 7.2** hereof.

"Permitted Transferee" shall have the meaning set forth in **Section 7.2** hereof.

"Person" shall mean any individual, corporation, partnership, association, limited liability company, trust, estate or other entity.

"Proposed Transferee" shall have the meaning set forth in **Section 7.6(a)** hereof.

8

"Remaining Offered Units" shall have the meaning set forth in **Section 7.6(c)** hereof.

"Reserve" shall mean an amount of funds deemed sufficient by the Board in its reasonable discretion, as of the date of determination, for working capital, capital required by Applicable Law, capital expenditures, other future uses of capital, and to pay taxes (specifically including the Board's authority to retain reserves for purposes of paying tax obligations of the Company), insurance, debt service and/or other costs and expenses incident to the operation of the Company.

"ROFR Oversubscription Notice" shall have the meaning set forth in **Section 7.6(c)** hereof.

"Sale Agreement" shall have the meaning set forth in **Section 7.5(b)** hereof.

"Sale Transaction" shall mean any transaction pursuant to which the Company sells its business by (i) a sale or conveyance of substantially all of the Company's assets to any Person, (ii) a sale or conveyance of more than fifty percent (50%) of the Units (or other equity interest in the Company) to any Person, or (iii) a merger or consolidation of the Company with any Person pursuant to which the Unit Holders (and their Affiliates) immediately prior to such merger or consolidation shall own, immediately after giving effect thereto, less than a majority of the equity interest of the surviving entity (or its parent) or the purchasing entity (or its parent), as the case may be.

"SEC" shall mean the Securities and Exchange Commission.

"Secretary of State" shall mean the Secretary of State of the State of Ohio.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Seventy Five Percent-in-Interest of the Members" shall mean Members whose aggregate Percentage Interest exceeds 75% of the Percentage Interests of all Members entitled to vote with respect to the applicable matter coming before the Members.

"Subsidiary" shall mean, with respect to the Company, any corporation, limited liability company, partnership, association or entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by the Company or one or more of the other Subsidiaries of the Company or a combination thereof, or (ii) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of membership, partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by the Company or one or more Subsidiaries of the Company or a combination thereof. For purposes hereof, the Company shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity (other than a corporation) if the Company shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be the manager, managing member, managing director or general partner of, or shall otherwise control the activities of, such limited liability company, partnership, association or other business entity.

9

"Tax Matters Partner" shall have the meaning set forth in **Section 9.5** hereof.

"Third Party Claim" shall have the meaning set forth in **Section 6.4(c)** hereof.

"Transfer" shall mean, when used as a noun, any sale, exchange, encumbrance, disposition, hypothecation, pledge, assignment, attachment, mortgage or other transfer or grant of rights or interests, whether voluntarily or involuntarily, by operation of law or otherwise, and, when used as a verb, means, to sell, exchange, encumber, dispose, hypothecate, pledge, assign, mortgage or otherwise transfer or grant rights or interests, whether voluntarily or involuntarily, by operation of law or otherwise.

"Unit" shall mean a limited liability company interest in the Company entitling the holder thereof to receive a share of distributions, income and losses of the Company in accordance with the terms of this Agreement. Units are owned by Unit Holders as set forth on **Schedule A** attached hereto, as amended from time to time in accordance herewith.

"Unit Holder" shall mean a Person who holds a Unit, whether as a Member, as an unadmitted assignee of a Member, or as a holder of Units who has not been admitted as a Member.

"Voluntary Withdrawal" shall mean a Member's resignation from the Company by such Member's express will or other voluntary act other than a Transfer of Membership Rights.

## ARTICLE II

## ORGANIZATIONAL MATTERS

Section 2.1    Formation of the Company  The Company was formed upon the execution and filing of the Certificate of Formation with the Secretary of State on October 18, 2013. The Board, in its individual capacity and as agent for the Members, shall accomplish all filing, recording, publishing and other acts necessary or appropriate for compliance with all the requirements for the existence of the Company as a limited liability company under the Act and under all other laws of the State of Ohio or such other jurisdictions in which the Board determines that the Company may conduct business. The rights and duties of the Managers, Members and Unit Holders shall be as provided in this Agreement and, to the extent not inconsistent with the terms of this Agreement, in the Act.

Section 2.2    Name.    The name of the Company is "KIMBERLITE APPLIED SCIENCE LLC," as such name may be modified from time to time by the Board. The Board shall notify the Unit Holders of any such change.

Section 2.3    Purpose.    The purpose of the Company shall be to (i) engage in the Business of designing, constructing, developing processes for and selling CVD reactors, (ii) engage in any and all activities necessary, desirable or incidental to the accomplishment of the Business, and (iii) engage in any lawful act or activity as determined by the Board for which limited liability companies may be organized under the Act.

10

Section 2.4    Location of Principal Place of Business.  The principal office and place of business of the Company shall be located at 220 Lincoln Avenue, Crestline, Ohio, or at such other place as the Board may designate from time to time.  The Board may change the location of the principal place of business of the Company and shall notify the Unit Holders of such change.  The Company may maintain such other offices as the Board may deem advisable at any other place or places within or outside of the United States.

Section 2.5    Registered Office and Registered Agent.  The Company's registered office and registered agent shall be as set forth in the Certificate of Formation, until such time as changed in accordance with this Agreement and the Act.

Section 2.6    Unit Holders.  The name, present mailing address, taxpayer identification number, Capital Contribution, Capital Account balance, number of Units and the Percentage Interest of each Unit Holder are set forth on **Schedule A**, as such **Schedule A** may be amended from time to time in accordance with the terms of this Agreement.

Section 2.7    Term.  The term of the Company commenced at the time the Certificate of Formation was marked "Filed" by the Secretary of State and shall continue in existence in perpetuity unless its existence is sooner terminated pursuant to **Article VIII** hereof.

Section 2.8    No State Law Partnership.  The Members intend that the Company shall not be a partnership (including, without limitation, a limited partnership) and that no Member shall be a partner of any other Member, for any purposes other than federal, state and local tax purposes, and the provisions of this Agreement shall not be construed otherwise.

Section 2.9    Voting Rights.  Except as otherwise expressly set forth herein, the Members shall be entitled to vote together as a single class on each matter submitted to a vote of the Company's Members pursuant to the terms of this Agreement.  Any action requiring the vote of the Company's Members shall be approved by:

(i)    written consent setting forth the action so taken, and signed by that number of Members whose votes would be required to approve such action under the terms of this Agreement.  Any such written consent shall be delivered to all Members of the Company pursuant to and in accordance with **Section 11.3** of this Agreement.  In the event that any Member fails to respond to a request of the Company or the Board for the approval of any action within the time period requested by the Company or the Board, which time period shall not be less than ten (10) days, shall be deemed an approval of such action by such Member.

(ii)    the affirmative vote of the Majority-in-Interest of the Members obtained at any meeting called and held to consider the doing of such action.  Notice of a meeting of the Members may be given by the Company or the Board at least ten (10) days prior to such meeting.  Any such notice shall state briefly the purpose, time and place of the meeting.  Meetings of the Members may be held by telephone or other electronic device and shall be held during normal business hours. Each Member shall have one (1) vote for each Percentage Interest

11

held by such Member. Unit Holders holding fifty percent (50%) or more of the Units of the Company shall constitute a quorum at any meeting of the Members.

## ARTICLE III

## UNITS AND CAPITAL CONTRIBUTIONS

Section 3.1    Units.    The Company shall initially issue one series of units with such rights, powers, preferences, obligations, qualifications, limitations and restrictions as set forth in this Agreement. Units are owned by Unit Holders as set forth on **Schedule A** attached hereto, as amended from time to time in accordance herewith. Subject to Section 6.1(h), the Board may issue additional Units from time to time, which additional Units may be issued in one or more outstanding classes or series of Units or in one or more new classes or series, the rights, powers, preferences, obligations, qualifications, limitations and restrictions of which shall be established by the Board. Subject to Section 6.1(h), such additional Units may (i) rank senior to, junior to, or pari passu with, outstanding Units as to the payment or the distribution of assets on liquidation, (ii) bear a stated distribution or allocation and/or rank senior to, junior to, or pari passu with, outstanding Units as to distributions of Net Cash Flow and/or allocations of Net Income and Net Losses, (iii) be redeemable by the holder thereof, (iv) have voting or other rights with respect to the management of the Company which rank senior to, junior to, or pari passu with, outstanding Units, and/or (v) otherwise have rights, powers or preferences which are senior (or otherwise superior) to, junior to, or pari passu with, any outstanding Units. In addition, subject to Section 6.1(h), the Board may from time to time issue options and/or warrants to purchase Units, with such terms as the Board may determine. Subject to Section 6.1(h), the Board shall have the right to amend this Agreement (including **Schedule A** hereto), without the consent of any Member (or Unit Holder), to reflect the relative rights, powers, preferences, obligations, qualifications, limitations and restrictions of the Units in connection with the issuance of additional Units and/or options or warrants to purchase Units.

Section 3.2    Capital Contributions.    As of the Effective Date, each Unit Holder acknowledges that such Unit Holder and each other Unit Holder has contributed or shall be deemed to have contributed to the Company cash or property in the amount set forth opposite its name on **Schedule A**.

Section 3.3    Additional Capital Contributions.    Subject to Section 6.1(h), the Board shall have the right to (i) raise additional equity capital for infusion into the Company from Members or any other Persons and issue additional Units, warrants and/or options to purchase Units, in connection therewith as provided in **Section 3.1**; provided, however, that no Unit Holder shall be required to participate in any such capital raise, and (ii) admit the Persons investing such equity capital as additional Members. The Company may obtain funds through loans having such terms and conditions as the Board may determine in its reasonable discretion. In connection with such loans, and subject to Section 6.1(h), the Company may issue Units, warrants and/or options to purchase Units pursuant to **Section 3.1**, upon such terms and conditions as the Board may determine in its sole discretion.

Section 3.4    Return of Capital Contributions.    No Unit Holder shall be entitled to receive any interest on its Capital Contributions. The Unit Holders shall not have the right to

12

demand return of their Capital Contributions except as otherwise expressly set forth in this Agreement, nor shall the Unit Holders have the right to demand and receive property other than cash in return for their Capital Contributions.

Section 3.5    Capital Accounts.  A separate Capital Account shall be maintained for each Unit Holder on the books of the Company.  Each Unit Holder acknowledges that, as of the Effective Date hereof, the Capital Account balance of such Unit Holder is the amount set forth opposite such Unit Holder's name on **Schedule A** attached hereto.

Section 3.6    Loans.  The Board may permit any Unit Holder, at any time, to make or cause a loan to be made to the Company in any amount and on those terms upon which the Company and the Unit Holder agree.

Section 3.7    Representations, Warranties and Covenants of Unit Holders.  Each Unit Holder represents and warrants to the Company and acknowledges, in each case as of the Effective Date, that:  (i) such Unit Holder has knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed investment decision with respect thereto; (ii) such Unit Holder has reviewed and evaluated all information necessary to assess the merits and risks of such Unit Holder's investment in the Company; (iii) such Unit Holder recognizes that the Company is a highly speculative venture involving a high degree of financial risk, and such Unit Holder is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time; (iv) such Unit Holder is acquiring Units for long term investment only and not with a view to, or for resale in connection with, any distribution to the public or public offering thereof; (v) the Units have not been registered under the Securities Act or the securities laws of any jurisdiction and cannot be disposed of unless they are subsequently registered and/or qualified, or an exemption from such registration and qualification requirements is available, under the Securities Act and other applicable securities laws and the provisions of this Agreement have been complied with; (vi) the Units were not offered by any means of general solicitation or general advertising, and no representation, warranty or written communication with respect to the Units were made to the Unit Holder, and in entering into this Agreement the Unit Holder is not relying upon any information other than that contained herein and the results of its own independent investigation; (vii) the execution, delivery and performance of this Agreement have been duly authorized by such Unit Holder and do not require such Unit Holder to obtain any consent or approval that has not been obtained and do not contravene or result in a default under any provision of any law or regulation applicable to such Unit Holder or other governing documents or any agreement or instrument to which such Unit Holder is a party or by which such Unit Holder is bound; (viii) the determination of such Unit Holder to purchase Units has been made by such Unit Holder independent of any other Unit Holder and independent of any statements or opinions as to the advisability of such purchase or as to the properties, business, prospects or condition (financial or otherwise) of the Company which may have been made or given by any other Unit Holder or by any agent or employee of any other Unit Holder; (ix) there are substantial restrictions on the transferability of the Units; there currently is no, and it is anticipated that there will never be any, public market for the Units; it may not be possible for such Unit Holder to liquidate such Unit Holder's investment in the Company; and, accordingly, such Unit Holder may have to hold the Units and bear the economic risk of this investment indefinitely; (x) such Unit Holder has been advised, and has been afforded time, to

13

consult with such Unit Holder's own attorney regarding legal matters concerning the Company and to consult with such Unit Holder's tax advisor regarding the tax consequences of investing in the Company; and (xi) this Agreement is valid, binding and enforceable against such Unit Holder in accordance with its terms. Each Unit Holder shall be deemed to have again made each representation and warranty set forth in this **Section 3.7** upon each issuance by the Company of additional Units to such Unit Holder subsequent to the date hereof.

**ARTICLE IV**

**DISTRIBUTIONS**

Section 4.1    Distribution Generally. Subject to **Sections 4.3** and **4.4**, the Board shall have the right, in its sole discretion, to determine whether, and to what extent, distributions of Net Cash Flow shall be made to the Unit Holders.

Section 4.2    Distributions of Net Cash Flow. Subject to **Sections 4.3** and **4.4**, all distributions of Net Cash Flow for any period shall be made in the following order of priority:

(a)    First, 100% to the Unit Holders, pro rata in accordance with their respective Adjusted Capital Contributions, until each Unit Holder has received distributions pursuant to this **Section 4.2(a)** in an amount sufficient to reduce such Unit Holder's Adjusted Capital Contribution to zero; and

(b)    Thereafter, 100% to the Unit Holders pro rata based on each Unit Holder's respective Percentage Interest as of the record date with respect to which the Board determines to make such distribution.

Section 4.3    Withholding Taxes. Notwithstanding anything to the contrary contained in this Agreement, in the event that any state, local or other income tax imposed on the Company as an entity is reduced by reason of the holding of a Unit by any Unit Holder, no part of the expense of the Company for such tax shall be allocated to such Unit Holder. In addition, except as otherwise provided in this **Section 4.3** if the Company is obligated under applicable law to pay any amount to a Governmental Body because of a Unit Holder's status as a Unit Holder of the Company for federal or state withholding or other taxes, such amount shall reduce the distributions which would otherwise be made to such Unit Holder pursuant to this **Article IV**. An amount shall be considered withheld by the Company if remitted to a Governmental Body without regard to whether such remittance occurs at the same time as the distribution or allocation to which it relates; provided, however, that an amount actually withheld from a specific distribution or designated by the Unit Holders as withheld from a specific allocation shall be treated as if distributed at the time such distribution or allocation occurs. To the extent operation of the foregoing provisions of this **Section 4.3** would create or increase a Unit Holder's negative balance in its Adjusted Capital Account, the amount withheld shall be treated as a loan by the Company to such Unit Holder, which loan shall be payable upon demand. Each Unit Holder shall indemnify the Company and the other Unit Holders for any liability they may incur for under withholding of taxes in respect of such Unit Holder; moreover, each Unit Holder hereby agrees that neither the Company nor any other Unit Holder shall be liable for any excess

14

taxes withheld and that, in the event of over withholding, a Unit Holder's sole recourse shall be to apply for a refund from the appropriate Governmental Body.

Section 4.4    Distributions with Respect to Tax.    Subject to the provisions of this **Article IV**, the Board shall, to the extent cash is available (as determined by the Board in good faith), cause the Company to distribute cash to each Unit Holder who is allocated taxable income pursuant to **Article V** hereof, in an amount not in excess of the net taxable income of the Company allocated to each such Unit Holder for such year times the highest federal and state income tax rate applicable to an individual residing in the State of Ohio, which tax rate shall be determined by taking into account the character of the income and/or gain realized by the Company and allocated to such Unit Holder. The Board shall be authorized, in its sole discretion, to make distributions to the Unit Holders pursuant to this **4.4** on a quarterly basis to allow the Unit Holders to pay their estimated federal and state income tax liabilities arising from their ownership of Units.  Distributions made under this **4.4** shall be treated as advance distributions against, and shall reduce the amounts otherwise distributable under, **Sections 4.2** or **10.3(d)**.

## ARTICLE V

## INCOME AND LOSSES

Section 5.1    Allocation of Net Income and Net Losses. Net Income and Net Losses and taxable income and losses of the Company shall be allocated to the Unit Holders in accordance their respective Percentage Interests after giving effect to the provisions of **Section 5.2**.

Section 5.2    Regulatory Allocations.

5.2.1. Qualified Income Offset. No Unit Holder shall be allocated Net Losses or deductions if the allocation causes a Unit Holder to have an Adjusted Capital Account Deficit. If a Unit Holder receives (1) an allocation of Loss or deduction (or item thereof) or (2) any distribution which causes the Unit Holder to have an Adjusted Capital Account Deficit at the end of any taxable year, then all items of income and gain of the Company (consisting of a pro rata portion of each item of Company income, including gross income and gain) for that taxable year shall be allocated to that Unit Holder before any other allocation is made of Company items for that taxable year, in the amount and in proportions required to eliminate the excess as quickly as possible. This **Section 5.2.1** is intended to comply with, and shall be interpreted consistently with, the "qualified income offset" provisions of the Regulations promulgated under Code Section 704(b).

5.2.2. Minimum Gain Chargeback. Except as set forth in Regulation Section 1.704-2(f)(2), (3), and (4), if, during any taxable year, there is a net decrease in Minimum Gain, each Unit Holder, prior to any other allocation pursuant to this Article IV, shall be specially allocated items of gross income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to that Unit Holder's share of the net decrease of Minimum Gain, computed in accordance with Regulation Section 1.704-2(g). Allocations of gross income and gain pursuant to this **Section 5.2.2** shall be made first from gain recognized from the disposition of Company assets subject to nonrecourse liabilities (within the meaning of the Regulations promulgated under Code Section 752), to the extent of the Minimum Gain

15

attributable to those assets, and thereafter, from a pro rata portion of the Company's other items of income and gain for the taxable year. It is the intent of the parties hereto that any allocation pursuant to this **Section 5.2.2** shall constitute a "minimum gain chargeback" under Regulation Section 1.704-2(f).

   5.2.3. <u>Contributed Property and Book-Ups</u>. In accordance with Code Section 704(c) and the "traditional" method in the Regulations thereunder, as well as Regulation Section 1.704-1(b)(2)(iv)(d)(3), income, gain, loss, and deduction with respect to any property contributed (or deemed contributed) to the Company shall, solely for tax purposes, be allocated among the Unit Holders so as to take account of any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value at the date of contribution (or deemed contribution). If the adjusted book value of any Company asset is adjusted as provided herein, subsequent allocations of income, gain, loss, and deduction with respect to the asset shall take account of any variation between the adjusted basis of the asset for federal income tax purposes and its adjusted book value in the manner required under Code Section 704(c) and the Regulations thereunder.

**ARTICLE VI**

**<u>POWERS, RIGHTS AND DUTIES OF THE BOARD AND MEMBERS</u>**

Section 6.1 <u>Management of the Company</u>.

  (a) <u>Board</u>.

   (i) The business and affairs of the Company shall be managed under the direction of a Board of Managers of the Company (the "**Board**"), which shall constitute the "manager" of the Company within the meaning of the Act. Except as otherwise specifically provided herein or by Applicable Law, the Board shall have full, exclusive and complete discretion to manage and control the business and affairs of the Company, to make all decisions affecting the business and affairs of the Company and to take all such actions as it deems necessary or appropriate to accomplish the purposes of the Company as set forth herein.

   (ii) Except as otherwise provided herein or expressly authorized by the Board, no Manager or officer of the Company, and no other Person, shall have the authority or power, directly or indirectly, to act as agent of the Company for any purpose, engage in any transaction, make any commitment, enter into any contract or incur any obligation (whether as principal, surety or agent) in the name of the Company or in any other way bind the Company or hold himself, herself or itself out as acting for or on behalf of the Company. Any attempted action in contravention of this Section shall be null, void <u>ab initio</u> and not binding upon the Company, unless ratified or authorized in writing by the Board.

  (b) <u>Number; Election; Tenure</u>.

   (i) Commencing on the date of this Agreement, the total number of Managers shall be ~~two~~ three (2~~3~~). —The initial Managers shall be Martin

16

Campbell, who shall also serve as the Chairman of the Board, and David Campbell and Alfred Genis. Subject to the approval of a Majority-in-Interest of the Members, the number of Managers may be increased or decreased from time to time by the Board in its sole discretion; provided, however, that in any event, Alfred Genis shall continue to be a Manager so long as he is an employee of the Company under the terms of the Employment Agreement.

(ii)     Each Manager shall hold office until his or her successor is appointed and has qualified, or until his or her earlier resignation or removal.

(iii)     An individual need not be a Unit Holder to be a Manager.

(c)     Removal and Resignation of Managers.

(i)     A Manager may resign at any time by giving written notice to the Board. Such resignation shall take effect upon receipt thereof by the Board, unless otherwise specified therein. The acceptance of a resignation shall not be necessary to make it effective.

(ii)     Any one or more of the Managers (A) shall automatically, without any further action by the Board, be removed from such position due to such Manager's death or Disability, and (B) may be removed from such position either with or without Cause, at any time by the consent of a Majority-in-Interest of the Members;s,provided however that a Majority-In-Interest of the Members may not remove Alfred Genis as a Manager under this clause (b) so long as Alfred Genis is an employee under the Employment Agreement.

(d)     Vacancies.  Any vacancy occurring on the Board for any reason shall be filled by a Majority-in-Interest of the Members.

(e)     Compensation; Reimbursement.     Subject to this **Section 6.1(e)**, no Manager or Member shall be entitled to be compensated for any services provided to the Company except as authorized in writing by the Board. The Company shall reimburse each of the Managers appointed pursuant to this **Section 6.1** for reasonable business expenses incurred by any such Manager on behalf of the Company, including, without limitation, any reasonable travel expenses associated with attending the Board meetings, which expenses will be treated as expenses of the Company. Nothing herein contained shall be construed to preclude any Manager or observer from serving the Company in any other capacity and receiving compensation therefor.

(f)     Meetings of the Board.

(i)     Time and Place.  Meetings of the Board shall be held at the principal place of business of the Company or at any other place that the Board determines. At any meeting, any Manager may participate by telephone or similar communication equipment, provided each Manager who is participating in the

17

meeting can hear each of the other Managers who are participating in the meeting. Persons present by telephone shall be deemed to be present "in person" for the purposes of the meeting. Meetings shall be held in accordance with a schedule established by the Board. In addition, any Manager may call a meeting of the Board upon at least two (2) Business Days' prior notice to the other Managers, provided such notice may be waived by all of the Managers for any individual meeting. Attendance of a Manager at a meeting shall constitute a waiver of notice of the meeting, except where such Manager attends for the express purpose of objecting to the transaction of any business because the meeting is not lawfully called or convened and notes such objection on the record. A notice pursuant to this section may be given orally or in writing, by personal delivery, by mail, by telephone, by facsimile or by electronic mail to such address, telephone or facsimile number as may be listed on the records of the Company.

(ii)     Quorum and Voting.  Each of As Chairman of the Board of Managers, Martin Campbell shall be entitled to two one (21) votes in all matters requiring a vote of the Board, and David Campbell and Alfred Genis shall be entitled to one (1) vote each in all matters requiring a vote of the Board. A majority of the entire Board shall constitute a quorum at any meeting of the Board. The act of a majority of the Managers present at any duly constituted meeting, if a quorum is present, shall be the act of the Board. If at any meeting of the Board there shall be less than a quorum present, the Manager or Managers present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall have been obtained; provided that the resumption of any such adjourned meeting shall be subject to (x) the participation of all of the Managers initially participating in the adjourned meeting or (y) notice of the date and time for resumption of such adjourned meeting pursuant to **Section 6.1(f)(i)** above. Any meeting not resumed, or, if resumed, not completed, during the originally scheduled time for such meeting, shall be deemed concluded at the end of such scheduled time, provided that this provision may be waived by all of the Managers present at any such meeting. All actions and decisions of the Board, once approved in accordance herewith, shall be binding on the Company and all Unit Holders.

(iii)     Written Consents in Lieu of a Meeting.  Any action required or permitted to be taken at any meeting of the Board may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by that number of Managers whose votes would be required to approve such action at a meeting of the Board.

(g)     Officers.  The Board may from time to time authorize or appoint individuals to act as officers or agents of the Company on a general basis or for a specific purpose, which individuals shall have full power and authority to act for and bind the Company as authorized by the Board. Each officer or agent of the Company appointed by the Board shall hold office until his or her successor is elected or appointed or until his or her earlier displacement from office by resignation, removal or otherwise. Any officer or agent of the Company may resign by written notice to the Company and may be removed for cause or

18

without cause by the Board in its sole discretion. Any number of offices may be held by the same person. An individual need not be a Unit Holder to be an officer of the Company.

(h)     <u>Action Requiring Approval by the Unit Holders.</u>     Notwithstanding anything to the contrary contained herein, except as otherwise provided herein, the Board shall not approve or undertake or authorize any other Person to approve or undertake, and shall not have the power or authority to approve or authorize any other Person to approve or undertake any of the following actions with respect to the Company or any of its Subsidiaries without the prior written consent of Seventy Five Percent-in-Interest of the Members:

(i)     enter into or approve any equity incentive plan, option plan, Unit appreciation plan, phantom Unit plan, profit participation or similar rights plan or other cash plans with respect to the Company or any Subsidiary; or

(ii)     except as otherwise permitted hereby, make any change in the rights, powers, preferences, obligations, qualifications, limitations and restrictions of the Members and/or Unit Holders.

Section 6.2     <u>Duties and Time Devoted to Business; Other Activities; Transactions with Affiliates.</u>

(a)     Each of the Members and the Managers shall devote such time to the Company's business as each Member and each Manager determines in such Member's or Manager's sole discretion is necessary to manage and supervise the Company's business and affairs in a professional manner.

(b)     Each Unit Holder understands and acknowledges that the conduct of the Company's business may involve business dealings and undertakings with Unit Holders, Managers and their respective Affiliates, nothing contained in this Agreement shall preclude such dealings and undertakings.

(c)     The Managers' and Members' duties to the Unit Holders and the Company are hereby limited to those expressly provided in this Agreement, including, but not limited to, this **Section 6.2.**

Section 6.3     <u>Rights of the Members.</u>     Notwithstanding anything to the contrary contained herein, except as required by Applicable Law, the individual Members (which, for the avoidance of doubt, shall not include Managers acting in their capacity as members of the Board) shall not participate in the management or control of the Company's business nor shall they transact any business for the Company, nor shall they have the power to act for or bind the Company, said powers being vested solely and exclusively in the Board.

Section 6.4     <u>Liability and Indemnification.</u>

(a)     Except as otherwise required by non-waivable provisions of Applicable Law or as expressly set forth in this Agreement, no Unit Holder shall have any personal liability whatsoever in such Unit Holder's capacity as a Unit Holder in excess of its Capital Contribution, whether to the Company, to any of the other Unit Holders, to the creditors of the Company or to

19

any other third party, for the debts, liabilities, commitments or any other obligations of the Company or for any losses of the Company, other than arising out of a breach of this Agreement by such Unit Holder, actions by such Unit Holder prohibited by this Agreement or as provided in any other written agreement between the Company and such Unit Holder.

(b)     None of the Members, Managers or officers shall be personally liable for the return of any portion of the Capital Contributions (or any return thereon) of the Unit Holders and the return, if any, of such Capital Contributions (or any return thereon) shall be made solely from assets of the Company.  None of the Members, Managers or officers shall be required to pay to the Company or any Unit Holder any deficit in any Unit Holder's Capital Account upon the dissolution of the Company or otherwise.  None of the Members, Managers or officers shall be liable, responsible or accountable, in damages or otherwise, to any Unit Holder or to the Company for any act performed by such Person within the scope of the authority conferred on such Person by the Board or this Agreement, except for gross negligence, fraud, bad faith or a material breach of this Agreement.

(c)     The Company shall, to the fullest extent permitted by the Act, indemnify, defend and hold harmless the Unit Holders, Members, Managers, officers and their respective partners, shareholders, members, managers, officers, trustees, advisory board members, directors, employees, attorneys and agents and other Affiliates (collectively, the "**Indemnified Parties**") from and against any loss, expense, damage or injury suffered or sustained by them by reason of any acts, omissions or alleged acts or omissions arising out of their activities on behalf of the Company or in furtherance of the interests of the Company in each case within the scope of authority conferred on such Person by the Board or this Agreement, including, but not limited to, any judgment, award, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the investigation and defense of any actual or threatened action, proceeding or claim, unless the acts, omissions or alleged acts or omissions upon which such actual or threatened action, proceeding or claim is based arose out of such Indemnified Party's gross negligence or were performed or omitted fraudulently or in bad faith by such Indemnified Party or constituted a material breach of this Agreement.  If any claim for indemnification is based on a claim by a third party (a "**Third Party Claim**"), the Indemnified Party in question shall give prompt written notice thereof to the Company and shall permit the Company to defend and/or settle such Third Party Claim, so long as it does so diligently and in good faith; provided, however, that no compromise or settlement of any claim may be effected by the Company without the Indemnified Party's consent (which will not be unreasonably withheld, conditioned or delayed) unless the sole relief provided is monetary damages that are paid in full by the Company.  Any such indemnification shall only be from the assets or insurance of the Company and no Unit Holder shall be required to contribute capital to the Company to satisfy any such indemnification.  Any such indemnification shall be paid by the Company in advance of the final disposition of any such action, proceeding or claim upon receipt of an undertaking by or on behalf of the Indemnified Party seeking advancement to repay the amount advanced should it ultimately be determined that the Indemnified Party was not entitled to be indemnified hereunder or under the Act.

## ARTICLE VII

### TRANSFER OF MEMBERSHIP RIGHTS AND UNITS; WITHDRAWAL OF MEMBERS

Section 7.1    Transfers.

(a)    Notwithstanding anything to the contrary contained herein, (i) no Unit Holder may Transfer any Units except if such Transfer is (x) permitted by **Section 7.2**, (y) required by **Section 7.5**, or (z) with the prior written consent of the Board, which consent may be given or withheld in its sole discretion; and (ii) no Member may Transfer any Membership Rights other than Units, except if such Transfer is pursuant to a Permitted Transfer described in **Section 7.2(b)(ii)** or **Section 7.2(b)(iii)** or, with the prior written consent of the Board, which consent may be given or withheld in its sole discretion.  Any transferee of Units from a Member pursuant to a Transfer in accordance with (1) clause (ii) of the preceding sentence shall automatically be admitted as a Member and such admission shall not require the consent of the Board, and (2) clause (i) of the preceding sentence shall be deemed to be an unadmitted assignee of the transferring Member and shall only be admitted as a Member (and granted Membership Rights) upon the written approval of the Board, which approval may be given or withheld in its sole discretion.

(b)    Each Member and Unit Holder agrees that such a transferee of Units will, upon the request of the Board, execute such transfer instruments reasonably required by the Board to Transfer Units permitted to be Transferred hereunder together with such other documentation as the Board may reasonably require, including certificates or other documents to preserve the limited liability of the Unit Holders under the laws of the jurisdictions in which the Company is doing business.  Each Member and Unit Holder further agrees that such transferee will pay all reasonable expenses, including, but not limited to, attorneys' fees and the cost of the preparation, filing and publishing of any amendment to the Certificate of Formation or this Agreement, incurred by the Company in connection with such Transfer.

(c)    Each Unit Holder hereby acknowledges the reasonableness of the prohibitions contained in this **Article VII** in view of the purposes of the Company and the relationship of the Members.  Any attempted Transfer in violation of this **Article VII** shall be void ab initio and of no force or effect.

(d)    The Transfer of Membership Rights and the admission of a substituted Member shall not be cause for dissolution of the Company.

(e)    Upon the Transfer of any Units or Membership Rights in accordance with the provisions of this **Article VII**, **Schedule A** shall be amended by the Board to reflect the name, present mailing address, taxpayer identification number, Capital Contribution, Capital Account Balance, number of Units and Percentage Interest of the transferee in such Transfer and the Percentage Interest of the other Members.

Section 7.2    Permitted Transfers.

(a)    Subject to **Section 7.1**, any Unit Holder may Transfer such Unit Holder's Units so long as such Transfer is pursuant to a Permitted Transfer and the following conditions are satisfied:

(i)    The Transfer will not require registration of Units under the Securities Act or any state securities laws and, if requested by the Board, the transferor delivers to the Company an opinion (reasonably acceptable in form and substance to the Board) of legal counsel reasonably acceptable to the Board to such effect;

(ii)    The transferee delivers to the Company a written instrument agreeing to be bound by all of the terms of this Agreement reasonably acceptable in form and substance to the Board;

(iii)    The Transfer will not result in the termination of the Company pursuant to Code Section 708 or the Company being treated as an association taxable as a corporation for Federal income tax purposes;

(iv)    The Transfer will not cause the Company to be treated as a "publicly traded partnership" within the meaning of Sections 7704 and 469(k)(2) of the Code;

(v)    The transferor or the transferee delivers the transferee's taxpayer identification number and the transferee's initial tax basis in the Transferred Units to the Company; and

(vi)    The Transfer is approved by the Board in its sole discretion.

(b)    For purposes hereof, a "**Permitted Transfer**" means a Transfer of Units by a Unit Holder that is (i) by bequest to, or for the benefit of, any Family Member of such Unit Holder, (ii) to a trust solely for the benefit of such Unit Holder or such Unit Holder's Family Members in respect of which such Unit Holder serves as the sole trustee; provided that the trust instrument governing said trust shall provide that such Unit Holder, as trustee, shall retain sole and exclusive control over the voting and disposition of such Units, or (iii) to a partnership or limited liability company whose only owners are such Unit Holder and/or such Unit Holder's Family Members and such Unit Holder retains sole and exclusive management control over such partnership or limited liability company, including sole and exclusive control over the voting and disposition of such Units. Any transferee in a Permitted Transfer is referred to herein as a "**Permitted Transferee.**"

Section 7.3    Voluntary Withdrawal of Members.    No Member shall have the right or power to Voluntarily Withdraw from the Company.  Any attempted Voluntary Withdrawal shall be void ab initio and of no force or effect, and any Member who shall attempt to Voluntarily Withdraw shall be in intentional breach of this Agreement. No Member who shall

22

Voluntarily Withdraw shall be entitled to receive, in liquidation of its Units, pursuant to the Act or otherwise, the fair value of the Member's Units as of the date of any Voluntary Withdrawal.

Section 7.4    Continuation of Company Upon Voluntary or Involuntary Withdrawal.

The Voluntary Withdrawal or Involuntary Withdrawal of a Member shall not cause a dissolution of the Company, and the Company shall continue as a limited liability company. The estate, trustee, receiver or other successor, as the case may be, shall be liable for all the obligations of the withdrawn Member. However, such estate, trustee, receiver or other successor shall be deemed to be an unadmitted assignee of the withdrawn Member and shall not become a Member except in accordance with this **Article VII**.

Section 7.5    Drag-Along.

(a)    If a Sale Transaction is approved by the Board (an "**Approved Sale**"), each Unit Holder shall (i) consent to (if, and only if, such Unit Holder's consent is required with respect thereto pursuant to Applicable Law) and raise no objection to the Approved Sale or the process pursuant to which the Approved Sale was arranged, (ii) waive any appraisal rights and other similar rights and (iii) (x) if the Approved Sale is structured as a sale of Units (or other equity interests of the Company), shall agree to sell all Units (or other equity interests of the Company) held by such Unit Holder on the terms and conditions approved by the Board, (y) if the Approved Sale is structured as a merger or consolidation, each Unit Holder shall vote in favor thereof (if, and only if, such Unit Holder has the right to vote with respect thereto pursuant to Applicable Law), and (z) if the Approved Sale is structured as a sale of all or substantially all of the assets of the Company, each Unit Holder shall vote in favor thereof (in each case, if, and only if, such Unit Holder has the right to vote with respect to such matters pursuant to Applicable Law).

(b)    In addition to the actions described in **Section 7.5(a)** above, each Unit Holder agrees to cooperate in consummating an Approved Sale, including, but not limited to, by (i) becoming a party to, executing and delivering the sale agreement (the "**Sale Agreement**") and all other appropriate related agreements, (ii) delivering at the consummation of such Approved Sale, instruments of transfer for the Units (or other equity interests of the Company) held by such Unit Holder reasonably required by the Company, duly endorsed for transfer, free and clear of all claims, liens and encumbrances, and (iii) taking any other necessary or appropriate action in furtherance thereof, including the execution and delivery of any other appropriate agreements, certificates, instruments and other documents.

(c)    Notwithstanding anything to the contrary herein, upon the consummation of a Sale Transaction, the Unit Holders shall cooperate and take all steps necessary to distribute the proceeds therefrom in accordance with **Section 8.3**.

Section 7.6    Right of First Refusal Subject to **Section 7.6(f)**, if at any time any Unit Holder proposes to transfer all or any part of such Unit Holder's Units (the "**Offered Units**") to any Person as permitted by **Section 7.1** (the "**Proposed Transferee**"), such Unit Holder shall submit a written notice (the "**Offer**") to the Company stating such Unit Holder's bona fide intention to transfer the Offered Units and disclosing the identity of the Proposed Transferee, the

23

number of Offered Units proposed to be sold and the terms and conditions, including price, of the proposed transfer. The Offer shall further state that the Company may acquire, in accordance with the provisions of this Agreement, all or any portion of the Offered Units for the price and upon the other terms and conditions set forth therein. Acceptance of the Offer must be made within twenty (20) days of the Company's receipt of the Offer (the "**Offer Period**").

(b)  In the event that the Company does not elect to exercise its right to acquire all of the Offered Units, the transferring Unit Holder shall submit a written notice (the "**Unit Holder Offer**") to each other Unit Holder disclosing the items included in the original Offer and indicating the remaining Offered Units to be purchased. The other Unit Holders shall have the right, subject to **Sections 7.6(c)** and **7.6(e)**, to purchase that number (or less than that number) of the remaining Offered Units as shall be equal to the number of remaining Offered Units multiplied by such Unit Holder's Percentage Interest (expressed as a decimal). The amount of Offered Units that each Unit Holder is entitled to purchase under this **Section 7.6(b)** shall be referred to as its "**First Refusal Portion**." Acceptance of the Unit Holder Offer must be made within twenty (20) days of each Unit Holder's receipt of the Unit Holder Offer (the "**Unit Holder Offer Period**").

(c)  If any Unit Holder does not accept its First Refusal Portion in full, the selling Unit Holder shall send written notice thereof (the "**ROFR Oversubscription Notice**") to each other Unit Holder who elected to purchase all or any portion of its First Refusal Portion (such Unit Holder, an "**Electing ROFR Unit Holder**"), which ROFR Oversubscription Notice shall also state the remaining amount of Offered Units which could have been purchased by Unit Holders who did not exercise their right of first refusal hereunder (the "**Remaining Offered Units**"). Each Electing ROFR Unit Holder shall have five (5) days from the date of receipt of the ROFR Oversubscription Notice (the "**Oversubscription Offer Period**") to agree to purchase all or any portion of the Remaining Offered Units (based on the relative Percentage Interests of the Electing ROFR Unit Holders) by providing written notice to the selling Unit Holder thereof within such five (5) day period. If, as a result thereof, such oversubscriptions exceed the total number of Offered Units available in respect of such oversubscription privilege, the oversubscribing Unit Holders shall be reduced with respect to their oversubscriptions on a pro rata basis based in the proportion that the First Refusal Portion of each oversubscribing Unit Holder bears to the First Refusal Portion of all oversubscribing Unit Holders, or as they may otherwise agree among themselves.

(d)  If the Company and/or the Unit Holders offer to purchase in the aggregate all of the Offered Units, such communications shall, when taken in conjunction with the Offer and the Unit Holder Offer, as applicable, be deemed to constitute a valid, legally binding and enforceable agreement for the sale and purchase of such Offered Units. Sales of the Offered Units pursuant to this **Section 7.6** shall be made at the offices of the Company on the thirtieth (30th) day following the last day of the Offer Period, the Unit Holder Offer Period or the Oversubscription Offer Period (or if any such day is not a Business Day, then on the next succeeding Business Day), as applicable. Such sales shall be effected by the amendment by the Board of **Schedule A** to reflect the purchased Offered Units and any other transfer documents reasonably requested by the Unit Holders.

(e)     If the Company and the Unit Holders do not offer to purchase in the aggregate all of the Offered Units, all of the Offered Units may be transferred by the selling Unit Holder to the Proposed Transferee at any time within ninety (90) days after the date the Offer or the Unit Holder Offer was made, subject to the provisions of **Section 7.7**.  Any such transfer shall be to the Proposed Transferee at not less than the price and upon other terms and conditions, if any, not more favorable to the Proposed Transferee than those specified in the Offer.  Any Offered Units not sold within such 90-day period shall continue to be subject to the requirements of a new offer pursuant to this **Section 7.6**.

(f)     The Unit Holders' right of first refusal provided in this **Section 7.6** shall not apply with respect to transfers of Units pursuant to **Section 7.2, 7.5** or **7.7** (if the applicable Offered Units to be transferred under **Section 7.7** were initially subject to the provisions of this **Section 7.6**).

Section 7.7    Co-Sale Right.         (a) If, subject to **Sections 7.6** and **7.7(d)**, any Unit Holder desires to transfer any Offered Units to the Proposed Transferee as permitted by **Section 7.1(a)(i)(z)** (other than a Permitted Transfer to a Permitted Transferee), such selling Unit Holder shall deliver a written notice (the "**Co-Sale Offer**") to each of the Unit Holders, setting forth the number of Offered Units proposed to be transferred, the terms and conditions for such transfer (such Offered Units proposed to be transferred by such selling Unit Holder, the "**Co-Sale Units**"), the identity of the Proposed Transferee (the "**Co-Sale Transferee**") to which the Units are intended to be transferred, and the terms and conditions, including price, of the proposed transfer, and each Unit Holder shall have the right to transfer a pro rata portion of such Unit Holder's Units to the Co-Sale Transferee, as a condition to such transfer by such selling Unit Holder, at the same price per Unit and on the same terms and conditions as involved in such transfer by such selling Unit Holder.  To the extent one or more Unit Holders exercise their right to sell Units to a Co-Sale Transferee in accordance with the terms and conditions set forth below, each such Unit Holder exercising the right contained in this **Section 7.7(a)** shall have the right to sell to the Co-Sale Transferee a number of Units equal to the number of Co-Sale Units multiplied by a fraction, the numerator of which shall be such Unit Holder's Percentage Interest, and the denominator of which shall be the aggregate Percentage Interests of the selling Unit Holder and all participating Unit Holders immediately prior to the sale of any Co-Sale Units to the Co-Sale Transferee.

(b)     Each Unit Holder wishing to so participate in any transfer under this **Section 7.7** shall notify the selling Unit Holder in writing of such intention as soon as practicable after such Unit Holder's receipt of the Co-Sale Offer, and in any event within fifteen (15) days after its receipt of the Co-Sale Offer.

(c)     The selling Unit Holder and each participating Unit Holder shall have the right to transfer to the Co-Sale Transferee all, or at the option of the Co-Sale Transferee, any part of the Units proposed to be transferred by them at not less than the price and upon other terms and conditions, if any, not more favorable to the Co-Sale Transferee than those in the Co-Sale Offer; provided, however, that any purchase of less than all of such Units by the Co-Sale Transferee shall be made from the selling Unit Holder and each participating Unit Holder pro rata based upon the relative amount of the Units that the selling Unit Holder and each participating Non-Selling Holder is otherwise entitled to transfer pursuant to **Section 7.7(a)**.

25

(d)     The Unit Holders' rights to participate in a transfer pursuant to this **Section 7.7** shall not apply with respect to transfers of Units pursuant to **Section 7.2, 7.5** or **7.6.**

Section 7.8     <u>Transferees Bound by Agreement</u>.  Any successor or transferee of a Unit Holder shall be subject to and bound by all of the provisions of this Agreement as if such successor or transferee was originally a party to this Agreement.

## ARTICLE VIII
## DISSOLUTION, LIQUIDATION, AND TERMINATION OF THE COMPANY

Section 8.1     <u>Dissolution</u>.  The Company shall only be dissolved upon the approval of the Board.

Section 8.2     <u>Procedure for Winding Up</u>.  In the event of the dissolution of the Company, the Board or a liquidating agent appointed by the Board (the Board or liquidating agent hereinafter referred to as the "**Liquidating Agent**") shall commence to wind up the affairs of the Company and to liquidate the Company's assets. The Unit Holders shall continue to share all income, losses and distributions during the period of liquidation in accordance with **Articles IV** and **V** above.  The Liquidating Agent shall have full right and unlimited discretion to determine the time, manner and terms of any sale or sales of Company property pursuant to such liquidation, giving due regard to the activity and condition of the relevant market and general financial and economic conditions.  If any assets of the Company are distributed in kind to the Unit Holders, those assets shall be valued on the basis of their fair market value, and any Unit Holder entitled to any interest in those assets may receive that interest as a tenant-in-common with all other Unit Holders so entitled.  The fair market value of the assets shall be determined by the Liquidating Agent in its reasonable discretion.

The Liquidating Agent shall have all of the rights and powers with respect to the assets and liabilities of the Company in connection with the liquidation and termination of the Company that the Members and the Board would have with respect to the assets and liabilities of the Company during the term of the Company, and the Liquidating Agent is hereby expressly authorized and empowered to execute any and all documents necessary or desirable to effectuate the liquidation and termination of the Company and the transfer of any assets.

Notwithstanding the foregoing, a Liquidating Agent which is not a Unit Holder shall not be deemed a Unit Holder and shall not have any of the economic interests in the Company of a Unit Holder; and such Liquidating Agent shall be compensated for its services to the Company at normal and customary rates for its services to the Company as reasonably determined by the Members.

Section 8.3     <u>Distributions at Liquidation</u>.  The Liquidating Agent shall, as soon as practicable, wind up the affairs of the Company and sell and/or distribute the assets of the Company.  The assets of the Company shall be applied in the following order of priority:

(a)     first, to pay the costs and expenses of the winding up, liquidation and termination of the Company;

(b)     second, to creditors of the Company, in the order of priority provided by law;

(c)     third, to establish Reserves adequate to meet any and all contingent or unforeseen liabilities or obligations of the Company; provided that at the expiration of such period of time as the Liquidating Agent may deem advisable, the balance of such Reserves remaining after the payment of such contingencies or liabilities shall be distributed as hereinafter provided; and

(d)     fourth, to the Unit Holders in accordance with **Section 4.2**.

Section 8.4   Negative Capital Account.  No Unit Holder shall be obligated to restore a Negative Capital Account.

Section 8.5   Termination.  The Company shall terminate when all property owned by the Company shall have been disposed of and the assets shall have been distributed as provided in **Section 10.3**.  The Liquidating Agent shall then execute and cause to be filed certificate of dissolution of the Company with the Secretary of State.

## ARTICLE IX

## BOOKS, RECORDS, ACCOUNTING, AND TAX ELECTIONS

Section 9.1   Bank Accounts.  All funds of the Company shall be deposited in a bank account or accounts maintained in the Company's name.  The Board shall determine the institution or institutions at which the accounts will be opened and maintained, the types of accounts, and the Persons who will have authority with respect to the accounts and the funds therein.

Section 9.2   Books and Records.  The Board shall keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's business.  The records shall include, but not be limited to, complete and accurate information regarding the state of the business and financial condition of the Company, a copy of the Certificate of Formation and this Agreement and all amendments to the Certificate of Formation and this Agreement; a current list of the names and last known business, residence, or mailing addresses of all Unit Holders; and the Company's federal, state or local tax returns.  Any Member, or its duly authorized representatives, shall be entitled to a copy of the list of names and addresses of the Members, provided such information shall be used only for Company purposes and to all other information to which Members may be entitled to review by the Act.

Section 9.3   Annual Accounting Period and Taxable Year.  The annual accounting period of the Company shall be its Fiscal Year.  The Company's taxable year shall be selected by the Board, subject to the requirements and limitations of the Code.

Section 9.4   Reports.  The Company shall use commercially reasonable efforts to send to each Unit Holder who was a Unit Holder at any time during the Fiscal Year then ended, within

ninety (90) days after the end of each Fiscal Year, the tax information concerning the Company which is necessary to prepare such Unit Holder's income tax returns for that Fiscal Year.

  Section 9.5 <u>Tax Matters Partner</u>. Martin Campbell shall act as the "tax matters partner" under Section 6231(a)(7) of the Code (the "**Tax Matters Partner**").  The Tax Matters Partner shall keep all Unit Holders informed of all notices from government taxing authorities which may come to the attention of the Tax Matters Partner.  The Company shall pay and be responsible for all reasonable third-party costs incurred by the Tax Matters Partner in performing those duties and any costs and expenses incurred by the Tax Matters Partner in connection with an audit of a Company income tax return.  A Unit Holder shall be responsible for any costs incurred by the Unit Holder with respect to any tax audit or tax-related administrative or judicial proceeding against any Unit Holder, even though it relates to the Company.  The Tax Matters Partner may be removed and replaced at any time upon the approval of a Majority-in-Interest of the Members.

  Section 9.6 <u>Tax Elections</u>.  The Board shall have the authority to make all Company elections permitted under the Code, including, but not limited to, elections of methods of depreciation and elections under Code Section 754.

  Section 9.7 <u>Title to Company Property</u>.  All real and personal property acquired by the Company shall be acquired and held by the Company in its name.

  Section 9.8 <u>Conversion of the Company</u>.  Each of the Unit Holders agrees that the Board shall have the sole and exclusive right, power and privilege to reorganize the Company into one or more different entities or forms (collectively, the "**New Entities**") by causing the Unit Holders to contribute their respective equity interests to a new corporation, or to merge the Company into a holding company ("**Holdco**"), or such other transaction as is appropriate in the judgment of the Board to cause the business of the Company to be conducted by a corporation (including, if and as deemed appropriate by the Board, the creation of a corporation, the transfer of all or substantially all of the Company's assets and liabilities to the corporation and the distribution to the Unit Holders of shares in the corporation); provided that immediately following the resulting reorganization each Unit Holder shall have substantially equivalent rights, including, but not limited to, rights with respect to liquidation preferences, voting rights, redemption rights, and preemptive rights, and be in substantially the same economic position as immediately prior to such reorganization.  Any action taken by the Board under this **Section 9.8** shall be final and binding on the Unit Holders.  The securities of the New Entities or Holdco issued in exchange for Units shall not be transferable to any greater degree than Units held subject to this Agreement and all such new securities of the New Entities or Holdco shall be subject to all restrictions provided herein as if such new securities were Units.  If requested by the Board each Unit Holder shall execute all documents (including amendments to this Agreement), and take any and all actions necessary or advisable, in the reasonable discretion of the Board to permit the Board to reorganize the Company as provided above, such actions to include execution and delivery of consents and agreements for a recapitalization of the Company or to the assignment of Company assets to another entity, and/or approval of a merger or consolidation of the Company with another entity.

## ARTICLE X

## AMENDMENTS AND WAIVERS

Section 10.1    Amendments and Waivers.  Subject to **Section 10.2,** and except for any amendment made by the Board otherwise expressly authorized herein, a provision of this Agreement may only be amended or waived from time to time by the written agreement of the Board and a Majority-in-Interest of the Members.

Section 10.2    Amendments Without Consent of the Members. In addition to any amendments which may be made by the Board otherwise expressly authorized herein, amendments may be made to this Agreement from time to time by the Board, without the consent of the Members, to (a) cure any ambiguity, to correct or supplement any provisions herein which may be inconsistent with any other provision herein; (b) delete or add any provision to this Agreement required to be so deleted or added by any federal or state agency deemed to be for the benefit or protection of the Members; or (c) better assure, in the opinion of counsel to the Company, that the Company will continue to be classified as a pass-through entity for purposes of Federal income taxes; provided, however, that no amendment shall be adopted pursuant to this **Section 10.2** unless the adoption thereof (i) is for the benefit of or not adverse to the interests of the Members; (ii) is consistent with **Section 8.3** hereof; and (iii) does not adversely affect the limited liability of the Unit Holders or the status of the Company as a pass-through entity for federal income tax purposes. Additionally, the Board may, without the consent of the Members, amend **Schedule A** from time to time to accurately reflect any additional Capital Contributions, issuance or Transfer of Units or the admittance of any new or substituted Members, in each case in accordance with the terms and conditions contained in this Agreement.

## ARTICLE XI

## GENERAL PROVISIONS

Section 11.1    Uniform Commercial Code.  Units and Membership Rights shall for all purposes be deemed to be a "security" under Articles 8 and 9 of the Uniform Commercial Code as adopted in any applicable jurisdiction.

Section 11.2    Further Assurances.  Each Unit Holder shall execute all such certificates and other documents and shall do all such filing, recording, publishing and other acts as the Board deems appropriate to comply with the requirements of Applicable Law for the formation and operation of the Company and to comply with any Applicable Law relating to the acquisition, operation or holding of the property of the Company.

Section 11.3    Notifications.  Any notice, demand, consent, election, offer, approval, request, or other communication (collectively, a "**Notice**") required or permitted under this Agreement must be in writing (which shall be deemed to include e-mail communications) and either delivered personally, sent by certified or registered mail, postage prepaid, return receipt requested, sent by recognized overnight delivery service or sent via e-mail (with confirmation). A notice must be addressed to a Unit Holder at the Unit Holder's address set forth on Schedule A attached hereto.  A notice to the Company must be addressed to the Company's principal office

29

(or the e-mail addresses of the Managers, if applicable). A notice that is sent by mail will be deemed given: (i) five (5) business days to an address within the United States of America or (ii) seven (7) business days to an address outside of the United States of America after it is mailed. A notice sent by recognized overnight delivery service will be deemed given when received or refused. A notice sent by e-mail will be deemed given on the date received if received prior to 5 p.m. (in the time zone in which the Company's principal place of business is located) or on the next day if received on the preceding day after 5 p.m. (in the time zone in which the Company's principal place of business is located). Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notices are to be directed to those substitute addresses or addressees.

      Section 11.4 <u>Specific Performance</u>. The parties recognize that irreparable injury will result from a breach of any provision of this Agreement and that money damages will be inadequate to fully remedy the injury. Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, any party who may be injured (in addition to any other remedies which may be available to that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act which would constitute a breach or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach.

      Section 11.5 <u>Complete Agreement</u>. This Agreement constitutes the complete and exclusive statement of the agreement among the Unit Holders with respect to the Units and the Members with respect to the Membership Rights.

      Section 11.6 <u>Applicable Law; Venue</u>. All questions concerning the construction, validity and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Ohio. Each Unit Holder hereby agrees that (a) any and all litigation arising out of this Agreement shall be conducted only in state or Federal courts located in the State of Ohio and (b) such courts shall have the exclusive jurisdiction to hear and decide such matters. Each Unit Holder hereby submits to the personal jurisdiction of such courts and waives any objection such Unit Holder may now or hereafter have to venue or that such courts are an inconvenient forum.

      Section 11.7 <u>Section Titles</u>. The headings herein are inserted as a matter of convenience only, and do not define, limit, or describe the scope of this Agreement or the intent of the provisions hereof.

      Section 11.8 <u>Binding Provisions</u>. This Agreement is binding upon, and inures to the benefit of, the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors, and permitted assigns.

      Section 11.9 <u>No Third Party Beneficiaries</u>. Nothing contained in this Agreement is intended to confer upon any Person, other than the parties hereto and any successors and assigns described herein, any rights or remedies under or by reason of this Agreement.

Section 11.10 <u>Terms</u>. Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the Person may in the context require.

Section 11.11 <u>Severability of Provisions</u>. Should any provision of this Agreement be held to be unenforceable or enforceable only if modified, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon each Unit Holder with any such modification to become a part hereof and treated as though originally set forth in this Agreement. The Unit Holders further agree that any court or arbitrator is expressly authorized to modify any such unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement, or by making such other modifications as it deems warranted to carry out the intent and agreement of the Unit Holders as embodied herein to the maximum extent permitted by law. The Unit Holders expressly agree that this Agreement as so modified shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal or unenforceable provisions had never been set forth herein.

Section 11.12 <u>Counterparts, Facsimile; Reproductions</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts shall together constitute one and the same instrument. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart. This Agreement and any amendments hereto, to the extent signed and delivered by means of a facsimile machine or PDF, shall be treated in all manner and respects and for all purposes as an original agreement and shall be considered to have the same binding legal effect as if it were the original signed version hereof delivered in person. At the request of any party hereto, each other party hereto shall re-execute original forms hereof and deliver them to all other parties. No party hereto shall raise the use of a facsimile machine to deliver a signature or the fact that any signature was transmitted or communicated through the use of a facsimile machine as a defense to the formation or enforceability of a contract and each such party forever waives any such defense. Upon execution in accordance herewith, this Agreement may be reproduced by any photographic, photostatic, microfilm, optical disk, micro-card, miniature photographic or other similar process, each of which reproduction of this Agreement shall be deemed an original.

**[Remainder of Page Intentionally Left Blank.**
**Signature Pages Follow]**

31

**IN WITNESS WHEREOF**, the undersigned have executed this Limited Liability Company Agreement as of the date first written above.

**MEMBERS:**

_____
Martin Campbell

_____
David Campbell

_____
~~Albert~~ Alfred Genis

<u>**SCHEDULE A**</u>

<u>**LIST OF MEMBERS, CAPITAL CONTRIBUTIONS, CAPITAL ACCOUNT
BALANCE, NUMBER OF UNITS AND PERCENTAGE INTEREST**</u>

| Name, Address and Taxpayer I.D. Number of Member/Unit Holder | Capital Contribution | Capital Account Balance | Units | Percentage Interest |
|---|---|---|---|---|
| Martin Campbell | $ | $ | | 41.25% |
| David Campbell | $ | $ | | 13.25% |
| ~~Albert~~ Alfred Genis | $ | $ | | 45.00 % |
| **TOTAL** | $ | $ | | 100.00% |

Formatted: Footer

**IN WITNESS WHEREOF,** the undersigned have executed this Limited Liability Company Agreement as of the date first written above.

MEMBERS:

_____

Martin Campbell


_____

David Campbell

_____

Albert Alfred Genis


Signature Page to Limited Liability Company Agreement

# EXHIBIT D

## EMPLOYMENT AGREEMENT

This **EMPLOYMENT AGREEMENT** (this "**Agreement**") is made as of the 4th day of October, 2013 (the "**Agreement Date**"), by and between Kimberlite Applied Science, LLC, a limited liability company formed under the laws of the State of Ohio (the "**Company**"), and Alfred R. Genis ("**Employee**").

### 1.       EMPLOYMENT SERVICES

**1.1      Term of Employment**.  Employee's term of employment under this Agreement (the "**Employment Term**") shall commence on the Agreement Date and continue until the fifth anniversary of such date, unless terminated earlier pursuant to **Article III** herein or extended in accordance with the terms hereof (as so terminated or extended, the" **Employment Term Termination Date**").  Unless previously terminated in accordance with the terms hereof, the applicable Employment Term Termination Date shall be extended automatically for a one year period unless, at least thirty (30) days prior to such Employment Term Termination Date, either party gives written notice to the other party that he/it does not wish to extend such Employment Term Termination Date. In such event, such Employment Term Termination Date shall not be extended.

**1.2      Position and Duties**.  During the Employment Term, Employee shall hold the position of Chief Technology Officer, and shall report to the President of the Company.  Employee shall perform such duties and responsibilities as are consistent with Employee's position and as may be assigned to Employee from time to time by the President and/or board of managers of the Company (the "**Board**"), subject to the power and authority of the President and the Board to expand or limit such duties and responsibilities and to override actions of officers of the Company. Employee shall devote Employee's full business time, attention, skill and energy to the business and affairs of the Company or as directed by the President, and Employee shall perform such responsibilities in a diligent, loyal, and businesslike manner.  Notwithstanding the foregoing, Employee shall have the right hereunder to (a) devote a reasonable amount of time and effort to civic and charitable organizations, and managing personal and family investments, but only to the extent that such activities, individually or as a whole, do not require Employee's active involvement in the management of any corporation, partnership or other entity, materially interfere with the execution of Employee's duties hereunder, or otherwise violate any provision of this Agreement or any agreement executed and delivered by Employee in connection with this Agreement, and (b) act as an officer of (i) Pure Crystal, LLC, a limited liability company formed under the laws of the State of Delaware ("**Pure Crystal**"), in accordance with an employment agreement to be executed by Genis and Pure Crystal, and (ii)  a limited liability company which will be an affiliate of the Company and will be in the business of developing, marketing and/or selling Chemical Vapor Deposition single crystal diamond for non-gem applications in accordance with an employment agreement to be executed by Genis and such company.

| Field Code Changed |
| Formatted: *LBFileStampAtEnd,FSE |



**EXHIBIT**

D

**2.**          **COMPENSATION; BENEFITS**

     **2.1**          **Base Salary.**   During the Employment Term, the Company shall pay Employee an annual base salary ("**Base Salary**") of One Hundred Fifty Thousand Dollars ($150,000.00), payable in accordance with the general payroll practices of the Company.

     **2.2**          **Company Equity.**    Upon the full execution and delivery of each of this Agreement, the operating agreement of the Company in form and substance acceptable to the parties hereto (the "**Kimberlite Operating Agreement**"), a license agreement (the "**Genis/Kimberlite License Agreement**") in form and substance acceptable to the parties hereto pursuant to which Employee grants to the Company an exclusive license to utilize reactor technology and operating policies and procedures owned by Employee (the "**Genis Reactor Technology**"), and any documents required to be executed by any person or entity in connection with any such documents (each such document is hereinafter referred to individually as a "**Transaction Document**" and collectively as the "**Transactions Documents**"), the Company shall issue to Employee membership interests in the Company equal to forty-five percent (45%) of the outstanding membership interests in the Company (the "**Company Equity**").

     **2.3**          **Reimbursement of Expenses.**   During the Employment Term, the Company shall reimburse Employee for all reasonable business expenses incurred by Employee while performing Employee's duties under this Agreement, subject to the Company's policies including the timely presentment of corroborating documentation reasonably satisfactory to the Company.  Any reimbursement required to be made pursuant to the previous sentence shall be made consistent with the reimbursement policies of the Company.

     [**2.4**          **Disability Insurance.** During the Employment Term, the Company will cause a disability insurance policy for wage coverage of up 180 days to be issued to Employee on the terms and conditions set forth on Schedule 2.4. at Company expense.~~expense~~ ~~.~~]

     **2.5**          **Health Insurance.**  During the Employment Term, the Company will provide a health insurance policy for Employee, Employee's spouse, and one child (subject to age restrictions of the policy) at Company expense on the terms and conditions set forth on Schedule 2.4.

     **2.6**          **Withholdings**. All amounts payable to Employee as compensation hereunder shall be subject to all required and customary withholdings by the Company.

**3.**          **TERMINATION OF EMPLOYMENT**

     **3.1**          **Voluntary Resignation.**    Employee may voluntarily terminate (a "**Voluntary Termination**") the Employment Term for any reason by giving the Company at least thirty (30) days prior written notice (the "**Voluntary Employment Termination Notice**") of his

desire to voluntaryily terminate the Employment Term by resignation and his effective resignation date ("**Resignation Date**"). .

3.2    **Termination By Company With Cause**.    The Company may terminate the Employment Term for Cause (as defined below) by giving written notice to Employee of such termination, which notice shall designate a termination date (the "**Cause Termination Date**"). For purposes of this Agreement, "**Cause**" means the occurrence of any of the following events: (A) Employee breaches Employee's obligations under this Agreement or any other Transaction Document, (B) Employee violates any rule or regulation imposed by any governmental agency having jurisdiction over the Company and fails to cure such breach within thirty (30) days of his receipt of written notice from the Company of such breach; (C) Employee commits a felony or other crime involving moral turpitude, commits any other act or omission involving dishonesty, disloyalty or fraud with respect to the Company, its customers or suppliers, or Employee engages in behavior that could, in the reasonable judgment of the Board, injure the integrity, character or reputation of Company; (D) Employee commits gross negligence or willful misconduct with respect to the Company; or (E) Employyee reporting to work under the influence of alcohol or illegal drugs..

3.3    **Termination By Company Without Cause**. The Company may terminate the Employment Term without Cause by giving written notice to Employee designating a termination date (the "**Non-Cause Termination Date**").

3.4    **Termination As a result of Inability.** The ~~Company~~ Employment Term shall terminate immediately upon Executive's death or inability, as determined by the Board in its sole discretion (such death or inability is hereinafter referred to as "**Inability**"), to perform the essential duties, responsibilities and functions of Employee's position with the Company as a result of any mental or physical disability or incapacity even with reasonable accommodations of such disability or incapacity provided by the Company or if providing such accommodations would be unreasonable.

3.5    **Termination for Non-Delivery of Transaction Documents**. In the event any Transaction Document is not fully executed by the parties thereto by December 31, 2013, each of the Company and Employee shall have the right to terminate the Employment Term on or after such date (the date of such termination is herein referred to as the "**Non-Delivery Termination Date**") by providing written notice of such termination to the other.

3.6    **Certain Effects of Termination**. (a) In the event the Employment Term is voluntarily terminated by Employee in accordance with Section 3.1, (i) Employee shall be entitled to receive his Base Salary through the Resignation Date, and shall not be entitled to any other salary, compensation or benefits from the Company, except as otherwise specifically provided for hereunder or required by applicable law; and (ii) Employee shall lose his right, title and interest in and to any Company Equity, and the Company shall have the right to terminate any such right, title and interest in and to such Company Equity and issue additional equity in the Company to other persons or entities in place thereof without any approval or any other action by Employee. Upon receiving a Voluntary Employment Termination Notice, the Company may require that Employee cease performing services for the Company at any time before the Resignation Date, so long as the

Formatted: *LBFileStampAtEnd,FSE

3

Company continues to pay Employee's Base Salary under **Section 2.1** through the Resignation Date.

(b) In the event the Employment Term is terminated by the Company with Cause in accordance with Section 3.2, (i) Employee shall be entitled to receive any Base Salary through the Cause Termination Date, and shall not be entitled to any other salary, compensation or benefits from the Company, except as otherwise specifically provided for hereunder or required by applicable law; and (ii) Employee shall lose his right, title and interest in and to any Company Equity and the Company shall have the right to terminate any such right, title  and interest in and to such Company Equity and issue additional equity in the Company to other persons or entities in place thereof without any approval or any other action by Employee.

(c) In the event the Employment Term is terminated by the Company without Cause in accordance with Section 3.3(a), (i) the Company shall pay Employee severance payments ("**Severance Payments**") in the aggregate amount equal to three (3) months of Base Salary, subject to the requirements set forth in this **Section 3.6(c)**; and (ii) Employee shall have the right to either (A) maintain his right, title and interest in and to any Company Equity in accordance with the terms of this Agreement and the Company Operating Agreement (the "**Employee Hold Option**"), or (B) sell the Company Equity back to the Company (the "**Employee Put Option**") for a purchase price equal to the Market Value of the Company Equity (as defined below); provided however that (1) Employee must provide the Company, within ten days of the Non-Cause Termination Date, written notice (the "**Employee Put Notice**") of his intent to exercise the Put Option on the terms set forth herein, (2) in the event an Employee Put Notice is not so provided, Employee shall not have any right to exercise the Employee Put Option and shall exercise the Employee Hold Option, (3) the purchase price for the Company Equity in connection with the exercise of the Employee Put Option will be paid with cash in the amount of seventy five percent (75%) of the Market Price of the Company Equity and a promissory note substantially in the form of Exhibit A hereto with a principle amount equal to twentyfifty five percent (25%) of the Market Price of the Company Equity, (4) as a condition to the closing of any sale of the Company Equity by Employee relating to the Employee Put Option in accordance with the terms hereof, Employee shall make to the Company the representations and warranties contained in Exhibit B hereto, and such representations and warranties shall be true and correct as of the date and time made; and (45) the closing relating to any such Employee Put Option shall occur no later than thirty (30) days after the delivery of the Employee Put Notice. Any Severance Payments shall be paid in substantially equal installments, according to the Company's regular payroll schedule, over a three (3) month period beginning on the first regular pay day following the fifteenth (15th) day after the Non-Cause Termination Date. As a condition to receiving the Severance Payments, Employee must timely execute and return to the Company, and not revoke any part of, a separation agreement (a "**Separation Agreement**") in form and substance acceptable to the Company and containing a general release and waiver of claims against the Company and its respective officers, directors, stockholders, employees and affiliates with respect to Employee's employment, and other customary terms (e.g., non-disparagement against the Company, confidentiality of the agreement, etc.). Any obligation of the Company to provide the Severance Payments shall cease: (i) if Employee breached or breaches his contractual obligations under anythe Transaction Documents, or in the Separation Agreement; or (ii) if Employee committed acts constituting Cause during the Employment Term. Except as otherwise provided by law and as otherwise set forth herein,

Formatted: *LBFileStampAtEnd,FSE

4

20305310.1

Employee shall not be entitled to receive any additional compensation or benefits from the Company after the Non-Cause Termination Date. For purposes hereof, "Market Value of the Company" shall mean the market value of the Company Equity, as determined by three (3) accounting firms, one chosen by the Company, one chosen by Employee and one chosen by the first two chosen accounting firms.

(d) In the event the Employment Term is terminated as a result of the occurrence of an Inability in accordance with Section 3.4 or an applicable Employment Term Termination Date not previously terminated in accordance with the terms hereof is not extended in accordance with the terms hereof and the Employment Term terminates on such Employment Term Termination Date (i) the Company shall pay Employee Severance Payments in the amounts and on the conditions set forth in Section 3.6(c) above, and Employee shall not be entitled to any other salary, compensation or benefits from the Company, except as otherwise specifically provided by law or set forth herein, and (ii) Company shall have the right to either (A) allow Employee to maintain his right, title and interest in and to any Company Equity in accordance with the terms of this Agreement and the Company Operating Agreement (the "**Company Hold Option**"), or (B) purchase the Company Equity back from the Employee for a purchase price equal to the Market Value of the Company Equity (the "**Company Repurchase Option**"; provided however that (1) the Company must provide to the Employee, within sixty days of the occurrence of the Inability, written notice (the "**Company Repurchase Notice**") of its intent to exercise the Company Repurchase Option on the terms set forth herein, (2) in the event a Company Repurchase Notice is not so provided, the Company shall not have any right to exercise the Company Repurchase Option and shall exercise the Company Hold Option, (3) the purchase price for the Company Equity in connection with the exercise of the Company Repurchase Option will be paid with cash in the amount of ~~forty~~ten percent (40%) of the Market Price of the Company Equity and a promissory note substantially in the form of Exhibit A~~C~~ hereto with a principle amount equal to ~~sixty~~ninety percent (60%) of the Market Price of the Company Equity, and (4) ~~as a condition to the closing of any sale of the Company Equity by Employee relating to the Company Repurchase Option in accordance with the terms hereof, Employee shall make to the Company the representations and warranties contained in Exhibit B hereto, and such representations and warranties shall be true and correct as of the time and date made; and (5)~~ the closing relating to any such Company Repurchase Option shall occur no later than ninety (90) days after the delivery of the Company Repurchase Notice. In the event the Company chooses not to exercise the Company Repurchase Option, the Company shall exercise the Company Hold Option in accordance with the terms of this Agreement.

(f) In the event the Employment Term is terminated in accordance with Section 3.5, (i) Employee shall be entitled to receive his Base Salary through the Non-Delivery Termination Date, and shall not be entitled to any other salary, compensation or benefits from the Company, except as otherwise specifically provided for hereunder or required by applicable law; and (ii) Employee shall lose his right, title and interest in and to any Company Equity, and the Company shall have the right to terminate any such right, title and interest in and to such Company Equity and issue additional equity in the Company to other persons or entities in place thereof without any approval or any other action by Employee.

**Formatted:** *LBFileStampAtEnd,FSE

4.    **VARIOUS COVENANTS; REPRESENTATIONS**

**4.1      Confidential Information.** (a)      Employee    acknowledges    that Employee will be entrusted with "**Confidential Information,**" defined as any non-public and proprietary information, in whatever form or medium, including, but not limited to, (i) strategic and long-range plans, advertising and marketing plans, research, reports, sales volume and methods, price lists, pricing policies or characteristics, business plans, and any information related to any of the foregoing, (ii) investor, strategic partner, customer, supplier and vendor lists and records, and the terms of such business relationships, (iii) trade secrets, (iv) financial statements, budgets and projections, (v) software and other technology owned or developed (or being developed) for use in or relating to the conduct of the business, and (vi) all other confidential or proprietary information belonging to the Company or relating to the Company's business; *provided, however,* that Confidential Information shall not include (1) knowledge, data and information that is generally known or becomes known to the public (other than as a result of any breach of an agreement with the Company), or (2) knowledge, data and information gained without a breach of this Agreement on a non-confidential basis from a person who is not legally prohibited from transmitting the information to Employee.

(b)      During the Employment Term and thereafter, Employee:  (i) shall hold the Confidential Information in strictest confidence, take all reasonable precautions to prevent the inadvertent disclosure of the Confidential Information to any unauthorized person, and follow all the Company's policies protecting the Confidential Information; (ii) shall not use, copy, divulge or otherwise disseminate or disclose any Confidential Information, or any portion thereof, to any unauthorized person; (iii) shall not make, or permit or cause to be made, copies of the Confidential Information, except as necessary to carry out Employee's authorized duties as an officer of the Company; and (iv) shall promptly and fully advise the Company of all facts known to Employee concerning any actual or threatened unauthorized use or disclosure of which Employee becomes aware.

(c)      If Employee receives any subpoena or becomes subject to any legal obligation that might require Employee to disclose Confidential Information, Employee will provide prompt written notice of that fact to the Board, enclosing a copy of the subpoena and any other documents describing the legal obligation.

(d)      Employee will not improperly use or disclose any confidential information or trade secrets, if any, of any former employer or of any other person to whom Employee has any obligation of confidentiality, and Employee will not bring onto the Company's premises any unpublished documents or any property belonging to any former employer or of any other person to whom Employee has an obligation of confidentiality.

**4.2      Ownership of Inventions**.

(a)      Employee agrees that any and all services or processes, inventions, discoveries, developments, concepts, methods, designs, improvements, techniques, programs, data (whether or not an application for protection has been filed under patent laws), works of authorship, information fixed in any tangible medium of expression (whether or not protected under copyright

Formatted: *LBFileStampAtEnd,FSE

6

20305310.1

laws), moral rights (defined as any right to claim authorship of a work, any right to object to any distortion or other modification of a work, and any similar right, existing under the law of any country, or under any treaty), patents, patent applications, mask works, trademarks, service marks, trade names, trade dress, trademark and service mark registrations and applications, domain names and domain name registrations, copyrights, copyright applications and registrations, trade secrets, publicity rights, know-how, ideas (whether or not protected under trade secret laws), and all other subject matter that have been or are developed, generated or produced by Employee, solely or jointly with others, at any time during Employee's employment with the Company ("**Company Inventions**"), shall be the exclusive property of the Company and, to the extent protectable by copyright, shall be "works made for hire," as that term is defined in the United States Copyright Act and any successor statutes. Employee waives any and all ownership, interest, moral rights or similar rights with respect thereto, and assigns to the Company all right, title and interest to the Company Inventions. Except as required in the performance of the Employee's legitimate job duties on behalf of the Company, Employee shall not, without the Company's prior written consent, reproduce, display, publish, perform, reverse engineer, distribute, modify, combine with other information or materials, create derivative works based on, exploit commercially, disclose, or otherwise use any Company Invention, in any manner or medium whatsoever.

(b)     During the Employment Term, Employee shall maintain adequate and current written records of all Company Inventions (which records shall be the Company's property), and shall promptly and fully disclose to the Company the nature and particulars of any inventions or research project undertaken on the Company's behalf. Employee shall execute all papers, and otherwise provide assistance, at the Company's request and expense, to enable the Company or its designees to obtain, utilize and enforce all proprietary rights with respect to the Company Inventions in any and all countries.

(c) Upon termination of the Employment Term for any reason, or upon receipt of written request from the Company, Employee shall immediately deliver to the Company all tangible and intangible property (including without limitation computers, computing devices, cell phones, memory devices and any other tangible item), drawings, notes, memoranda, specification, devices, notebooks, formulas and documents, together with all copies of any of the foregoing, and any other material containing, summarizing, referencing, or incorporating in any way or otherwise disclosing any Company Inventions or Confidential Information of the Company.

**4.3     Non-Competition**. During the Employment Term and for a period of two (2) years thereafter (the "**Restricted Period**"), Employee shall not, directly or indirectly, alone or in combination with any other Person, own (other than through the passive ownership of less than one percent (1%) of the publicly traded shares of any Person), operate, manage, engage or participate in, render services for, or otherwise assist in any supervisory capacity or other capacity similar to the capacity in which Employee was employed by the Company, any individual, enterprise or entity (other than the Company) that, directly or indirectly, engages in or proposes to engage in the Business (as defined below). For purposes hereof, the "**Business**" shall mean engaging in the business of producing, marketing, researching and/or developing [plasma reactors], (y) any business engaged in by the Company relating to the business described in clause (x) during the period in which Employee is a member or employee of the Company, and/or (z) any other business that the Company engaged in or actively planned to engage in during the period in which Employee was a member or employee of the Company.

7

Formatted: *LBFileStampAtEnd,FSE

**4.4**   **Non-Interference of Business Relationships**.   During the Restricted Period, Employee shall not (other than in furtherance of Employee's legitimate job duties on behalf of Company), directly or indirectly, alone or in combination with any other Person, (i) employ, offer employment to, or otherwise attempt to hire, as an employee, consultant, owner, independent contractor or otherwise, or, except in connection with Employee's legitimate performance of his duties to the Company, persuade or encourage the termination of employment with or engagement by the Company (or assist any other Person to take any such action regarding), any individual who was employed or engaged by the Company during the twelve (12) month period prior to the termination of the Employment Term or during the six (6) month period thereafter (the "**Covered Period**"), (ii) solicit or attempt to solicit business related to the Company's business from any Person that was an investor, client, strategic partner or joint venturer of the Company during the Covered Period; or (iii) otherwise influence or alter, or attempt to influence or alter, any relationship between the Company and any other person or entity.

**4.5**   **Equitable Modification**.   If any court of competent jurisdiction shall deem any provision in this **Article IV** too restrictive, the other provisions shall stand, and the court shall modify the unduly restrictive provision to the point of greatest restriction permissible by law.

**4.6**   **Remedies**.   Employee acknowledges that the agreements and covenants contained in this **Article IV** are essential to protect the Company and its business.   Should Employee breach any covenants in this **Article IV**, then among other remedies, the duration of the covenant shall be extended by the period of any such breach.   Employee agrees that irreparable harm would result from Employee's breach or threat to breach any provision of this **Article IV**, and that monetary damages, alone, would not provide adequate relief to the Company for the harm incurred.   Employee agrees that in addition to money damages, the Company shall be entitled to seek and obtain temporary, preliminary, and/or permanent injunctive relief restraining Employee from committing or continuing any breach without being required to post a bond.

**4.7**   **Employees's Representations and Warranties**.   Employee hereby represents and warrants to the Company that (i) the execution, delivery and/or performance of this Agreement by Employee do not and will not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which Emloyee is a party or by which he is bound, and (ii) upon the execution and delivery of this Agreement by the parties hereto, this Agreement shall be the valid and binding obligation of Employee, enforceable in accordance with its terms. .

**5.**   **POST TERMINATION OBLIGATIONS**

**5.1**   **Return of Company Materials**.   No later than three (3) business days following the termination of Employee's employment for any reason, Employee shall return to the Company all company property that is then in Employee's possession, custody or control, including, without limitation, all keys, access cards, credit cards, computer hardware and software, documents, records, policies, marketing information, design information, specifications and plans, data base information, products, samples, and lists, and any other property or information that Employee has or had relating to the Company (whether those materials are in paper or computer-stored form),

Formatted: *LBFileStampAtEnd,FSE

8

20305310.1

and including but not limited to any documents containing, summarizing, or describing any Confidential Information.

**5.2**     **Employee Assistance**.  During the Employment Term and for a period of twelve (12) months thereafter, Employee shall, upon reasonable notice, furnish the Company with such information as may be in Employee's possession or control, and cooperate with the Company in any reasonable manner that the Company may request, including without limitation conferring with the Company with regard to any litigation, claim, or other dispute in which the Company is or may become a party.  The Company shall reimburse Employee for all reasonable out-of-pocket expenses and lost wages directly incurred by Employee in fulfilling Employee's obligations under this **Section 5.2**.

## 6 MISCELLANEOUS

**6.1**     **Notices**.  Any notices, consents or other communications required or permitted to be sent or given hereunder shall be in writing and shall be deemed properly served if (a) delivered personally, in which case the date of such notice shall be the date of delivery; (b) delivered to a nationally recognized overnight courier service, in which case the date of delivery shall be the next business day; or (c) sent by facsimile transmission (with a copy sent by first-class mail), in which case the date of delivery shall be the date of transmission, or if after 5:00 P.M., the next business day.  If not personally delivered, notice shall be sent using the addresses set forth below:

> If to Employee:
>
>> Alfred R Genis
>> 101 Franklin St.
>> Douglas, MA 01516
>
> If to the Company:
>
>> Kimberlite Applied Science, LLC
>> 220 Lincoln Ave.
>> Crestline, OH 44827
>> Facsimile: (419) 683-1336
>> Attn:  Martin Campbell

or such other address as may hereafter be specified by notice given by either party to the other party.  Employee shall promptly notify the Company of any change in his address set forth on the signature page.

**6.2**     **Successors and Assigns**.  This Agreement shall not be assignable by Employee without the Company's written consent.  The Company may unilaterally assign this Agreement to any successor employer or corporation or entity that purchases the assets of or succeeds to the business of the Company; provided such successor employer or entity assumes and agrees in writing to perform all of the Company's obligations under this Agreement.  Subject to the

Formatted: *LBFileStampAtEnd,FSE

9

20305310.1

foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and assigns.

  **6.3**   **Waivers**.  No provision of this Agreement may be waived except by a writing executed and delivered by the party against whom waiver is sought.  Any such written waiver shall be effective only with respect to the event or circumstance described therein and not with respect to any other event or circumstance, unless such waiver expressly provides to the contrary.

  **6.4**   **Severability; Survivability**.  If any term or provision of this Agreement shall be held to be invalid or unenforceable, the remaining terms and provisions hereof shall not be affected thereby.  Except as otherwise provided in this Agreement, Employee's obligations in **Articles IV** and **V** shall survive and continue in full force notwithstanding the termination of this Agreement or Employee's employment for any reason.

  **6.5**   **Execution in Counterparts; Facsimile**.  This Agreement may be executed in one or more counterparts, each of which shall be considered an original instrument, but all of which shall be considered one and the same agreement.  This Agreement, and any amendments hereto, to the extent signed and delivered by means of a facsimile machine or other electronic transmission (including "pdf"), shall be treated in all manners and respects and for all purposes as an original agreement and shall be considered to have the same binding legal effect as if it were the original signed version hereof delivered in person.  At the request of any party hereto, each other party hereto shall re-execute original forms hereof and deliver them to all other parties.  No party hereto shall raise the use of a facsimile machine or other electronic transmission to deliver a signature or the fact that any signature was transmitted or communicated through the use of a facsimile machine or other electronic transmission as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

  **6.6**   **Arbitration**.  Any legal or equitable claim or controversy arising out of or relating to this Agreement, Employee's employment by the Company or the termination of that employment (whether by Employee or the Company) shall be subject to and resolved by binding arbitration in accordance with the Federal Arbitration Act and the National Rules for the Resolution of Employment Disputes of the American Arbitration Association which are then in effect (the "**Rules**"); *provided, however*, that this agreement to arbitrate shall not apply to or cover: (i) any claim by Employee for workers' compensation benefits or unemployment compensation benefits;, and (ii) any claim by the Company for injunctive or equitable relief, including without limitation claims that the Employee has violated any part of Article IV of this Agreement, and any claims involving violations of representations or warranties, intellectual property, unfair competition, or trade secrets.

A party seeking arbitration must: (i) deliver a written demand for arbitration and the applicable filing fee to the Chicago office of the AAA; and (ii) on the same day, send a copy of that demand to the other party.  In accordance with the Rules, the demand must describe all claims the party seeks to arbitrate, and must be received by the AAA and the other party within the applicable statute of limitations governing that claim, or the party seeking arbitration will be barred from pursuing that claim.  Unless otherwise required by law, if Employee initiates arbitration, Employee and the Company will each bear one-half of the cost of the applicable filing fee and expenses of the

**Formatted:** *LBFileStampAtEnd,FSE

arbitrator.  If the Company seeks arbitration, the Company will pay the filing fee and expenses of the arbitrator.  Each of the Employee and the Company shall bear its respective costs and expenses of the arbitration, unless the arbitrator reallocates responsibility for payment of such costs.  All aspects of the arbitration process, including the demand for arbitration, the hearing, and the record of the proceeding, shall be confidential and shall not be open to or disclosed to any third party or the public.

6.7     **Governing Law; Consent to Jurisdiction;** .

EACH OF THE PARTIES IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE STATE COURTS OF THE STATE OF OHIO FOR THE PURPOSES OF ANY SUIT, ACTION OR OTHER PROCEEDING ARISING OUT OF THIS AGREEMENT, ANY RELATED AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY WITH RESPECT TO EMPLOYEE'S EMPLOYMENT HEREUNDER THAT IS NOT OTHERWISE SUBJECT TO ARBITRATION UNDER SECTION 6.6.  EACH OF THE PARTIES HERETO FURTHER AGREES THAT SERVICE OF ANY PROCESS, SUMMONS, NOTICE OR DOCUMENT BY U.S. REGISTERED MAIL TO SUCH PARTY'S RESPECTIVE ADDRESS SET FORTH ABOVE SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY ACTION, SUIT OR PROCEEDING IN WITH RESPECT TO ANY MATTERS TO WHICH IT HAS SUBMITTED TO JURISDICTION IN THIS PARAGRAPH 6.720.  EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY OBJECTION TO THE LAYING OF VENUE OF ANY ACTION, SUIT OR PROCEEDING ARISING OUT OF THIS AGREEMENT, ANY RELATED DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IN THE STATE COURTS OF THE STATE OF OHIO AND HEREBY AND THEREBY FURTHER IRREVOCABLY AND UNCONDITIONALLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION, SUIT OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

6.8     **Waiver of Jury Trial**.  AS A SPECIFICALLY BARGAINED FOR INDUCEMENT FOR EACH OF THE PARTIES HERETO TO ENTER INTO THIS AGREEMENT (AFTER HAVING THE OPPORTUNITY TO CONSULT WITH COUNSEL), EACH PARTY HERETO EXPRESSLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY LAWSUIT OR PROCEEDING RELATING TO OR ARISING IN ANY WAY FROM THIS AGREEMENT OR THE MATTERS CONTEMPLATED HEREBY.

6.9     **Corporate Opportunity**.  During the Employment Period, Executive shall submit to the Company all business, commercial and investment opportunities or offers presented to Executive or of which Executive becomes aware which relate to the business of the Company at any time during the Employment Period ("**Corporate Opportunities**").  Unless approved by the Managers, Executive shall not accept or pursue, directly or indirectly, any Corporate Opportunities on Executive's own behalf.

6.10    **Construction**.  The language used in this Agreement will be deemed to be the language chosen by Employee and the Company to express their mutual intent, and no rule of strict construction will be applied against Employee or the Company.

Formatted: *LBFileStampAtEnd,FSE

20305310.1

**6.11** **Entire Agreement; Amendments**.  This Agreement contains the entire understanding of the parties hereto with regard to the subject matter contained herein, and supersedes all prior agreements, understandings or letters of intent with regard to the subject matter contained herein between the parties hereto.  This Agreement shall not be amended, modified or supplemented except by a written instrument signed by each of the parties hereto.

\*       \*       \*

Formatted: *LBFileStampAtEnd,FSE

12

20305310.1

**IN WITNESS WHEREOF**, each of the parties hereto has duly executed this Employment Agreement as of the date first set forth above.

**COMPANY:**

KIMBERLITE APPLIED SCIENCE, LLC

By:    _____

Name:   <u>Martin Campbell</u>

Title:    <u>President</u>

**EMPLOYEE:**

_____

Alfred R. Genis

Address:   101 Franklin St.

      Douglas, MA 01516

**Formatted:** *LBFileStampAtEnd,FSE

20305310.1

**IN WITNESS WHEREOF**, each of the parties hereto has duly executed this Employment Agreement as of the date first set forth above.

**COMPANY:**

KIMBERLITE APPLIED SCIENCE, LLC

By: _____

Name:    <u>Martin Campbell</u>

Title:    <u>President</u>

**EMPLOYEE:**

Alfred R. Genis

Address:    101 Franklin St.

    Douglas, MA 01516

13

# EXHIBIT E

## EXCLUSIVE LICENSE AGREEMENT

This Exclusive License Agreement ("**Agreement**") is entered into, effective as of December ____, 2013 ("**Effective Date**"), between Alfred R. Genis, a resident of the State of Massachusetts ("**Licensor**"), and Kimberlite Applied Science, LLC, a limited liability company formed under the laws of the State of Ohio ("**Licensee**").

Licensor owns the intellectual property rights described in Schedule 1 hereto (the "**Intellectual Property**"), and desires to have the Intellectual Property exploited for commercial purposes. Licensee desires to obtain the exclusive right to exploit the Intellectual Property commercially on the terms set forth herein.

**Therefore**, in consideration of the mutual obligations set forth below, Licensor and Licensee agree as follows:

## ARTICLE 1

## DEFINITIONS

In this Agreement:.

~~"**Closing Date**" means December ___, 2013.~~

"**Confidential Information**" "**means** any non-public and proprietary information, in whatever form or medium, including, but not limited to (i) strategic and long-range plans, advertising and marketing plans, research, reports, sales volume and methods, price lists, pricing policies or characteristics, business plans, and any information related to any of the foregoing, (ii) investor, strategic partner, customer, supplier and vendor lists and records, and the terms of such business relationships, (iii) trade secrets, (iv) financial statements, budgets and projections, (v) software and other technology owned or developed (or being developed) for use in or relating to the conduct of the Company's business, and (vi) all other confidential or proprietary information belonging to the Company or relating to the Company's business; *provided, however*, that Confidential Information shall not include (1) knowledge, data and information that is generally known or becomes known to the public (other than as a result of any breach of an agreement with the Company), or (2) knowledge, data and information gained without a breach of this Agreement on a non-confidential basis from a person who is not legally prohibited from transmitting the information to Employee.

"**Employment Agreement**" means that certain Employment Agreement, dated as of October 4, 2013, between Alfred Genis and Licensee, as amended or otherwise modified and in effect.

"**Losses**" means any and all direct or indirect demands, claims, payments, obligations, recoveries, deficiencies, fines, penalties, interest, assessments, proceedings, actions, causes of action, suits, losses, diminution in the value of the assets or business of the Company, damages (including punitive, exemplary, special, incidental or consequential damages), lost income, profits and business interruptions, liabilities, costs, and expenses (including (i) interest, penalties and

**EXHIBIT**

E

reasonable attorneys' fees and expenses actually incurred with respect to third party claims, (ii) reasonable attorneys' fees and expenses actually incurred and necessary to enforce rights to indemnification hereunder, and (iii) reasonable consultants' and investigators' fees and other costs of defense or investigation).

"**Operating Agreement**" means the operating agreement of Licensee, as amended or otherwise modified and in effect.

"**Permitted Transaction**" is defined in Section 8.1.

"**Product(s)**" means any product or process or license therefor that, in whole or in part, absent the license granted hereunder, would infringe one or more claims of the Intellectual Property, or would have infringed one or more claims of the Intellectual Property if sold, used or licensed in the Territory, and (i) any process that uses any such product; (ii) any product that is manufactured by using any such process, or that, when used, practices any such process; or (iii) any service that uses any such products or processes.

"**Royalty Period**" means a six (6) month period during a calendar year, either beginning on January 1 and ending June 30 or beginning on July 1 and ending December 31, except that the initial Royalty Period shall begin on the Effective Date and end on December 31 of that same calendar year.

"**Sublicense**" means an agreement in which Licensee (i) grants or otherwise transfers any of the Intellectual Property, (ii) agrees not to assert such rights or to sue, prevent or seek a legal remedy for the practice of same, (iii) assigns or otherwise transfers this Agreement and/or the rights acquired by it, or (iv) is under an obligation to grant, assign or transfer any such rights or non-assertion, or to forebear from granting or transferring such rights to any other entity, including without limitation licenses, option agreements, right of first refusal agreements, or other agreements. Notwithstanding any provision hereof, "Sublicense" shall not include any agreement or any other arrangement entered into in connection with a Permitted Transaction.

"**Sublicensee**" means any person or entity to which a Sublicense is granted. Notwithstanding any provision hereof, "Sublicensee" shall not include an assignee of this Agreement created through a Permitted Transaction under Section 8.1.

"**Term**" is defined in Section 7.1.

"**Territory**" means the territory set forth on Schedule 1.


## ARTICLE 2

## GRANT OF LICENSE

2.1.     **Grant.** Subject to the termination provisions of this Agreement, Licensor hereby grants to Licensee:

(a)     subject to the terms hereof, the exclusive right to use the Intellectual Property, to identify, develop, make, have made, use, import, export, lease, sell, have sold, and offer for sale, Products within the Territory and for all other actual and/or potential uses; and

(b)     the exclusive right to grant Sublicenses of the rights granted herein, subject to the applicable provisions of this Agreement.

-The rights granted to Licensee under this Section 2.1 are hereinafter sometimes referred to as the "License".

> **Formatted:** Indent: First line:  0"

2.2.     **Compensation for License**. Licensee shall issue equity to Licensor in accordance with the terms of the Employment Agreement and the Operating Agreement, and the issuance of such equity shall be Licensor's sole compensation for the grant of the License to Licensee under the terms herof.

2.3.     **Sublicenses**.

(a)     Each Sublicense (i) shall contain terms no less protective of Licensor's rights than those set forth in this Agreement, (ii) shall not be in conflict with this Agreement, and (iii) shall identify Licensor as an intended third party beneficiary of the Sublicense.

(b)     Upon termination of this Agreement for any reason, all Sublicenses shall terminate.

## ARTICLE 3

### RECORDS; REPORTS

3.1     **Records**.  Licensee shall keep accurate records relating to the Intellectual Property in sufficient and customary detail.  During the term of this Agreement and for a period of five (5) years thereafter, Licensee shall permit Licensor or its representative, during normal business hours, to inspect, audit and copy its books and records relating to the Intellectual Property.  Such examination shall be made at Licensor's expense. The results of such examination shall be treated as Confidential Information.

3.2     **Commercialization and Reporting Requirements**.     Licensee shall use commercially reasonable efforts to bring one or more Products to market and to develop the markets for such Product through a reasonably thorough, vigorous, and diligent program for the commercial exploitation of the Intellectual Property in connection with such Products.

### ARTICLE 4

### WARRANTIES; INDEMNIFICATION

As a material inducement to Licensee to enter into this Agreement and consummate the transactions contemplated hereby, Licensor hereby represents and warrants to Licensee that the following statements are true, complete and correct in all respects, as of the Effective Date:

4.1    **Authority; Absence of Violations**.  (a) The execution, delivery and performance of this Agreement and the other contracts, documents and instruments to be executed and delivered by Licensor pursuant to this Agreement, have been duly authorized by all necessary action on the part of Licensor in compliance with all applicable laws.  This Agreement constitutes the valid and binding agreement of Licensor enforceable against him, subject to bankruptcy and debtor creditor laws of general application.

(b) The execution, delivery and performance of this Agreement does not (and will not with the passage of time or the giving of notice or both) constitute a violation of, conflict with, constitute a default or require any consent or payment under, permit a termination of, or result in the creation or imposition of any agreement, obligation lien or other restriction upon or relating to any of the Intellectual Property, or result in any diminishment of Licensor's right to use or otherwise enjoy the Intellectual Property, under: (1) any agreement or commitment to which Licensor is a party or is subject or by which his properties are bound, (2) any permit or order to which Licensor or any of his properties is subject or bound, or (3) any applicable laws.

4.2    **No Agreements**. Licensor has not entered into any contracts, agreements or obligations relating to the Intellectual Property.

4.3    **No Legal Proceedings**.  There is no claim, action, suit, proceeding, arbitration, mediation, or, to Licensor's knowledge, investigation or inquiry, pending before any governmental authority, or any private arbitration or mediation tribunal, or, to Licensor's knowledge, threatened against Licensor, relating to or affecting the Intellectual Property and, to Licensor's knowledge, there is no reasonable basis for same. Licensor is not subject to and is not under any order with respect to the Intellectual Property. There is no action, suit, proceeding, claim, arbitration, grievance, or investigation pending or, to the knowledge of Licensor, threatened against or affecting the Intellectual Property or which would prevent, hinder, or delay the consummation of the transactions contemplated hereby, nor is Licensor aware of any reasonable basis for any such action, suit, proceeding, claim, arbitration, grievance, or investigation.

4.4    **Consents and Approvals**.  No consent, approval, authorization, permit, order, filing, registration, or qualification of or with any court, governmental authority, or any other person or entity is required to be obtained by Licensor (whether under applicable law, pursuant to agreements to which Licensor is a party, or otherwise) in connection with the execution and delivery of this Agreement or the consummation by Licensor of the transactions contemplated hereby in the manner contemplated hereby.  Licensor has received all consents, waivers, authorizations and approvals to the transactions contemplated by this Agreement as may be necessary, and has made all necessary registrations, declarations and filings with governmental or other applicable authorities.

4.5    **Compliance with Applicable Laws**. Licensor is in compliance with all applicable laws. Licensor has not received any written notice to the effect that, or otherwise been advised in writing that, Licensor is not in compliance with any applicable law and, to Licensor's knowledge, there are no presently existing circumstances that are reasonably likely to result in any violation of any applicable law.

4.6     **Other Information**.  None of the information and documents (including this Agreement and the exhibits, schedules and other attachments hereto) furnished or to be furnished to Licensee by Licensor or any of its representatives or agents pursuant to this Agreement, is or will be false or misleading or contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact required to make the statements therein not misleading, or required to provide a complete description of the Intellectual Property.

4.7     **Intellectual Property**. (a)     Schedule 4.7 contains a list or description of all Intellectual Property.  Except as set forth on Schedule 4.7, no third party is engaged in any activity not duly authorized by Licensor that constitutes an infringement of any Intellectual Property.  Except as set forth on Schedule 4.7, there are no claims or proceedings pending or, to the knowledge of Licensor, threatened against Licensor asserting that Licensor has, is, or was infringing any patent, trademark, trade name, or other intellectual property rights of any other person or entity in connection with the use of Intellectual Property.  Except as set forth on Schedule 4.7, Licensor is the sole owner and possesses all right, title, and interest in and to all Intellectual Property.  The Intellectual Property is fully and freely assignable to Licensee in accordance with the terms hereof and is free and clear of any liens or any other encumbrances.  There are no royalties, honorariums, or fees payable by Licensor to any other person or entity by reason of the ownership or use of the Intellectual Property.

> **Commented [JL1]:** Marty, can you provide a description?

(b)     There are no limitations, defects or threats, pending or other circumstances that exist that could reasonably cause the invalidity, unenforceability or other loss of any Intellectual Property.  There are no claims or proceedings pending or, to Licensor's knowledge, threatened against Licensor: (A) alleging that Licensor has infringed upon or otherwise violated, or caused or induced any person or entity to infringe upon or otherwise violate, any known right or claimed right of any person or entity, under or with respect to any Intellectual Property of any other person or entity, or (B) challenging the validity or enforceability of any Intellectual Property;

(c)     Licensor has not violated or infringed any intellectual property of others in connection with the Intellectual Property;

(d)     Licensor has not disclosed to any person or entity not obligated to maintain the confidentiality thereof any Intellectual Property the value of which is contingent upon confidentiality without securing an appropriate confidentiality agreement, and there have been no violations of any such confidentiality obligations or any such agreements; and

(e)     Licensor has not entered into any covenant not to compete, trademark agreement, patent agreement or other contract limiting or purporting to limit the ability of Licensor to transact business in any market or geographical area or with any person or entity.

4.8     **No Restrictions**.  Licensor is not subject to any non-solicitation, non-competition or similar restrictive covenant agreement.

4.9.    **Indemnification**. Licensor hereby covenants and agrees to defend, indemnify and hold harmless Licensee and its affiliates (collectively, the "Licensee Indemnitees") from and

against, and pay or reimburse the Licensee Indemnitees for, any and all Losses resulting from, arising out of, in connection with or relating to: (a) any breach or inaccuracy of any representation or warranty made by Licensor in this Agreement or in any agreement delivered by Licensor pursuant to this Agreement; and (b) any breach or failure of Licensor to perform any covenant or agreement contained in this Agreement or under any document or agreement delivered pursuant to this Agreement. Notwithstanding anything to the contrary, no investigation by or knowledge of Licensee shall affect, limit or diminish Licensee's rights to indemnity contained in this Section 4.9.

### ARTICLE 5

### CONFIDENTIALITY

5.1     **Confidentiality.** In connection with this Agreement, each party may disclose Confidential Information to the other party.

(a)     Each party shall maintain the Confidential Information of the other party in confidence for a period of three (3) years from the date of receipt of the Confidential Information or until one (1) year after the termination of this Agreement or any extension thereof, whichever is later, and shall not disclose or otherwise communicate such Confidential Information to others, or use it for any purpose except pursuant to, and in order to carry out, the terms and objectives of this Agreement and documents executed and delivered in connection with this Agreement, and shall exercise every reasonable precaution to prevent and restrain the unauthorized disclosure of such Confidential Information by any of its agents or representatives.

(b)     The provisions of Section 5.1 shall not apply to any Confidential Information that:

(i)     Was lawfully disclosed to the recipient by an independent third party rightfully in possession of the Confidential Information; or

(ii)     Has been published or generally known to the public in accordance with Article 6 or otherwise through no fault or omission by a party; or

(iii)     Was independently known to the recipient prior to receipt from the disclosing party, or was independently developed by the recipient, as demonstrably documented in written records of the recipient; or

(iv)     Is required to be disclosed by a party to comply with court orders or applicable laws, to defend or prosecute litigation, or to comply with governmental regulations, provided that such party takes reasonable and lawful actions to avoid and/or minimize the degree of such disclosure.

### ARTICLE 6

### INFRINGEMENT

6.1     **Notification.** Each party shall promptly report in writing to the other party any infringement or suspected infringement of any Intellectual Property or unauthorized use or misappropriation of the Product or Intellectual Property by a third party (each an "Infringement") of which it becomes aware.

The reporting party shall provide the other party with all evidence in its possession of the infringement, suspected infringement or unauthorized use or misappropriation.

6.2     **Licensee Right to Prosecute.**  Licensee may initiate an infringement suit or other appropriate action against any third party who at any time has infringed or is suspected of infringing any of the Intellectual Property.  Licensee shall give Licensor advance written notice of its intent to initiate any such action and the reasons therefor and shall provide Licensor with a reasonable opportunity to make suggestions and comments regarding such action. Licensee shall keep Licensor promptly informed of material developments in any such action. Licensee shall pay all expenses of such action. Licensor shall provide reasonable assistance to Licensee in connection with such action at no charge to Licensee except for reimbursement of reasonable out-of-pocket expenses.

6.3     **Licensor Right to Prosecute.**  In the event that Licensee does not within nine (9) months after receiving written notice from the Licensor, or providing written notice to the Licensor, of an Infringement (a) secure cessation of the Infringement, or (b) enter suit against the infringer, or (c) provide Licensor with evidence of the pendency of a bona fide negotiation for the acceptance by the infringer of a Sublicense, Licensor shall thereafter have the right to take action against the infringer at Licensor's own expense.  Licensee shall offer reasonable assistance to Licensor in connection with any such action at no charge to Licensor except for the reimbursement of reasonable out-of-pocket expenses.

## ARTICLE 7

### TERM AND TERMINATION

7.1.     **Term.**  The term of this Agreement ("Term") shall commence upon the Effective Date and shall continue, unless terminated earlier under Section 7.2 or 7.3 or otherwise extended under this Section 7.1, until November 30, 2033 (the "Term Termination Date"). Licensee shall have the right to extend the Term Termination Date for an additional twenty-year period by (a) providing written notice to Licensor that it desires to so extend the Term Termination Date, and (b) delivering to Licensor with such notice immediately available funds in the amount of $3 million.

7.2     **Licensor Right to Terminate.**  Licensor may terminate this Agreement at any time by written notice to Licensee:

> (a)     If Licensee defaults on or breaches any provision of this Agreement, and Licensee fails to cure any such default or breach within one hundred and eighty  (180) days after written notice from Licensor; or

> (b)     If Licensee commences a voluntary case as a debtor under the Bankruptcy Code of the United States or any successor statute (the "**Bankruptcy Code**"), or if an involuntary case is commenced against Licensee under the Bankruptcy Code, or if an order for relief shall be entered in such case, or if the same or any similar circumstance shall occur under the laws of any foreign jurisdiction and Licensee fails to vacate or have such case dismissed, or to cause such purported lien or encumbrance to be removed, within one hundred and twenty (120) days of receiving notice thereof;.

7.3.     **Licensee Right to Terminate**.  Licensee may terminate this Agreement at any time by written notice to the Licensor:

(a)     If the Licensor defaults on or breaches any provision of this Agreement, and Licensor fails to cure any such default or breach within sixty (60) days after written notice from the Licensee;

(b)     If any representations or warranty of Licensor contained in this Agreement or any other agreement delivered in connection with the terms hereof are not true and correct as of the time made; or

(c)     If Licensee determines in its sole discretion that it no longer wants to license the Intellectual Property in accordance with the terms of this Agreement.

Termination shall be effective (i) upon expiration of the cure period in the circumstance described in subsection (a) above, and (ii) at the end of the Royalty Period immediately following the Royalty Period in which the notice is effective in the circumstance described in subsection (cb) above.

7.4.    **Effect of Termination.** If this Agreement terminates for any reason, on the effective date of termination Licensee shall immediately cease, and cause its Sublicensees immediately to cease, using, making, having made, importing, exporting, leasing, selling, having sold, and offering for sale or license the Intellectual Property and Products,.

## ARTICLE 8

## MISCELLANEOUS

8.1.    **Assignment.** This Agreement shall not be assigned by Licensee without the prior written consent of Licensor, which may be granted or withheld in the sole discretion of Licensor; provided however, that the Licensee may assign this Agreement without the consent of Licensor in connection with a merger of Licensee with another entity, a sale of the Equity Rights in Licensee or a sale of significant assets of Licensee. Any such merger or sale is herein referred to as a "Permitted Transaction"). This Agreement shall not be assigned by the Licensor without the prior written consent of Licensee, which may be granted or withheld in the sole discretion of Licensee.

8.2.    **Entire Agreement, Amendment and Waiver.**   This Agreement (including any attached schedules and exhibits referred to in this Agreement) contains the entire understanding of the parties with respect to the subject matter of this Agreement and supersedes any and all prior written or oral discussions, arrangements, courses of conduct, or agreements with respect to the subject matter of this Agreement.  This Agreement may be amended only by an instrument in writing duly executed by the parties.  The waiver of a breach of this Agreement will be effective only if in writing and signed by the waiving party; waiver of a breach will not constitute a waiver of any other breach.

8.3.    **Notices.**  All notices required or desired to be given under this Agreement shall be delivered to the parties at the addresses set forth on Schedule 2.  Notices may be given (i) by hand, (ii) by a nationally recognized overnight delivery service, or (iii) by facsimile transmission followed by confirmation of delivery.  The date of personal delivery, the date of deposit with the overnight delivery service for next business day delivery, or the date of sending by facsimile, shall be the date such notice is deemed effective under this Agreement.

8.4.    **Governing Law.** This Agreement shall be governed by and interpreted under the laws of Ohio, excluding its conflict of laws provisions.

8.5.     **Jurisdiction.**  All actions or proceedings related to this Agreement shall be litigated in state courts of competent jurisdiction located within the State of Ohio.  Licensor (i) consents and submits to the jurisdiction of any Ohio state court with competent jurisdiction, (ii) consents to delivery and service of process by means of the notice provisions established in this Agreement, and (iii) shall not bring any action or claim against Licensee in any other jurisdiction.

8.9.     **Implementation.**  Each party shall, at the request of the other party, execute any document reasonably necessary to implement the provisions of this Agreement.

8.10.     **Counterparts.**  This Agreement may be executed in multiple counterparts, each of which when taken together shall constitute one and the same instrument.

8.12.     **Headings; References.**  The headings of the sections, subsections, and paragraphs of this Agreement have been added for convenience only and shall not be deemed to be a part of this Agreement, nor shall they affect the interpretation or construction of this Agreement in any manner.   Section or subsection references in this Agreement are references to sections or subsections of this Agreement, and references to schedules or exhibits are references to schedules or exhibits attached to this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers or representatives on the date indicated below.

**Licensor:**

_____

Alfred R. Genis

Date: _____

**Licensee:**

**KIMBERLITE APPLIED SCIENCE, SLLC**

By: _____

Name: _____

Title: _____

Date: _____

Pg. 10 of 13

<u>**Schedule 1 to Exclusive License Agreement**</u>

**"Intellectual Property"** includes the following:

**"Territory"** means: Worldwide

**Schedule 2 to Exclusive License Agreement**

**Article 8 Miscellaneous**

8.3     Notices:

    (a)   Address for All Notices
        And Payments to Licensor:

    (b)   Address for Notices to         Kimberlite Applied Sciences, LLC
        Licensee                        [Address]

                                       Attention:  Martin Campbell

Pg. 13 of 13

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers or representatives on the date indicated below.

Licensor:

AI     R. Genis

Date: 12/1/13

Licensee:

**KIMBERLITE APPLIED SCIENCE, LLC**

By: _____

: _____

Title: _____

Date: _____

Pg. 10 of 13